UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-02531-GPG-KAS

TERRIANNE PAIGE HIEHLE, in her individual capacity and
behalf of all others similarly situated; et al.

      Plaintiff(s),

v.

EDWARD ABER, In his individual and official capacities as Jail Commander of the La
Plata County Jail; et al.

      Defendant(s).

_____

## LA PLATA COUNTY DEFENDANTS' MOTION TO DISMISS
_____

Defendants La Plata County, La Plata County Sheriff's Office, Sean Smith in his individual and official capacities, Michael Slade and Jacob Harris (collectively, the "La Plata Defendants") respectfully file the following Motion to Dismiss.[1]

### I.      INTRODUCTION

The Complaint in this case alleges surreptitious acts of voyeurism that Defendant Edward Aber engaged in for his own sexual gratification. The Complaint does not, and cannot, plausibly allege that Aber's job description or duties included engaging in such

---

[1] **Certificate of Conferral:** Pursuant to D.C.Colo.LCivR 7.1A, undersigned counsel for the La Plata Defendants conferred with Jason Kosloski, Tyler Jolly and Phillip Fairbanks, who indicated Plaintiffs oppose the relief requested herein. Consistent with D.C.COLO.MJ V-9, the parties engaged in a substantive conferral concerning the issues argued herein, and Plaintiffs indicated they would stand on their Complaint as drafted.

acts, or that any official policy or custom condoned them. Nor does it allege La Plata County Sheriff Sean Smith or any other final County policymaker had any knowledge or notice that Aber was reviewing strip-search videos at all, much less for improper purposes. And with respect to Deputies Slade and Harris, it fails to allege knowledge that Aber was reviewing strip-search videos for non-penological purposes. The Complaint therefore fails to state claims against any of the La Plata Defendants under governing Supreme Court and Tenth Circuit standards.

## II.    FACTS ALLEGED IN COMPLAINT

Inmates entering the La Plata County Detention Facility (the "Jail") undergo a strip search during the booking process.[2] The Jail requires strip searches for security purposes, including the detection of contraband. *See* Complaint (Doc. 1), ¶ 32. Deputies conducting strip searches wear body cameras that record the search, and recorded videos are stored in evidence.com. *See id.*, ¶ 34. Access to the videos is restricted, typically to those holding the rank of Lieutenant or above. *See id.,* ¶ 35.

Aber joined the Sheriff's Office in 2005, after serving with the Durango Police Department from 1997-2005. *See id.*, ¶ 38. During his tenure with the Durango Police, he "was the subject of at least one allegation of sexual impropriety or harassment." *Id.* The Complaint does not describe when that allegation was made, what it was, or the outcome of any investigation related to it. The Complaint alleges the Sheriff and La Plata County knew of this accusation. *See id.*

---

[2] The La Plata Defendants disagree with many of the Complaint's allegations, and recite them here only for purposes of this Motion in accordance with Rule 12.

Aber became Jail Commander in 2018, and had supervisory authority over the Jail and its personnel. *See id.*, ¶ 39. His role as Commander gave him access to inmate strip-search videos. Other than the access restriction based on rank, the Complaint alleges the Sheriff and La Plata County placed no restrictions on access to the videos. *See id.*, ¶ 41.

Between 2019 and 2024, Aber accessed and viewed strip-search videos through evidence.com for his own sexual gratification, rather than for any legitimate law enforcement purpose. *See id.*, ¶¶ 42, 46. While doing so, he took screenshots of certain inmates' anatomy. *See id.,* ¶ 54. Aber resigned due to accusations of workplace harassment in July of 2024. *See id.,* ¶ 61. It was not until October 2024, after a forensic analysis of his computer, that the Sheriff's Office discovered Aber had accessed strip-search videos for improper purposes. *See id.,* ¶ 62.

The Complaint alleges that Sheriff Smith had supervisory authority over Aber, and that he was responsible for establishing and enforcing policies and procedures governing jail operations and the protection of inmates' constitutional rights. *See id.*, ¶ 17. Otherwise, the Complaint refers to Smith only in the Fourth through Seventh, and Eleventh through Thirteenth Claims for Relief. Each Claim for Relief consists only of a formulaic recitation of the elements of each cause of action; none contains any additional factual allegations. The only allegations against Smith, therefore, are that he was Aber's supervisor, that he had control of the Jail, and that he failed to foresee and prevent Aber's misconduct.

The Complaint sets forth factual allegations concerning Deputies Slade and Harris in paragraphs 57 and 58. Paragraph 57 alleges Aber approached both and informed them he was viewing strip-search videos. It then asserts a legal conclusion: that there was no legitimate law enforcement purpose for Aber or anyone else to view strip-search videos. Paragraph 58 then alleges that neither Slade nor Harris took any steps to intervene. Neither these paragraphs nor any others in the Complaint alleges when this interaction took place or identifies Slade's and Harris's role within the Sheriff's Office, beyond describing them as deputies.

## III.    STANDARD OF REVIEW

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quotation omitted). A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019) (applying *Iqbal* to § 1983 claims).

## IV.    ARGUMENT

### A.    Neither Federal Nor State Law Imposed a Duty to Intervene on the Individual Defendants.

The Fourth through Sixth, and Eleventh through Thirteenth, Claims for Relief assert federal and state claims for failure to intervene against Smith, Slade and Harris in their personal capacities. The Fourth through Sixth claims arise under 42 U.S.C. § 1983, and assert the individual defendants should have intervened to prevent Aber from violating Plaintiffs' Fourth Amendment rights, Fourteenth Amendment substantive due process rights, and Fourteenth Amendment equal protection rights. The Eleventh through Thirteenth arise under § 13-21-131, C.R.S. ("§ 131"), and mirror the federal claims filed under § 1983, invoking parallel state constitutional provisions.

Section 131 is a relatively new law, and few cases address it.  The La Plata Defendants know of no Colorado appellate decision addressing claims for failure to intervene under § 131. The Colorado Court of Appeals has, however, concluded that federal decisions under § 1983 provide persuasive authority in cases filed under § 131. *See Woodall v. Godfrey,* 553 P.3d 249, 256 (Colo. App. 2024); *see also Shash v. City of Pueblo*, 770 F. Supp. 3d 1279, 1308 (D. Colo. 2025) (citing *Casper v. Vallario*, 2024 WL 3978459, at *6 (Colo. App. 2024)).

In the Tenth Circuit, "[a] plaintiff states a constitutional violation in the form of failure to intervene by alleging that 1) a government officer violated his constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so."  *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022).

Prior to the November, 2022 decision in *Bledsoe*, the only published Tenth Circuit decisions recognizing failure-to-intervene claims involved excessive use of force. *See id.* at 617. *Bledsoe*, in a split 2-1 panel decision, then recognized a duty to intervene to halt a conspiracy to frame a criminal defendant for murder. Five months earlier, a different panel unanimously held the Tenth Circuit's excessive force precedent did not clearly establish an officer's duty to intervene to halt a search associated with a traffic stop. *See Shaw v. Schulte*, 36 F.4th 1006, 1020-21 (10th Cir. 2022).

The Complaint includes no allegations that Smith observed or had reason to know that Aber was viewing strip-search videos, much less for a non-penological purpose. Nor could it – Aber's accessing and viewing of these videos was not even discovered until after he resigned and a forensic analysis of his computer revealed his abuse of the evidence.com system. Complaint, ¶¶ 61, 62.

With respect to Slade and Harris, ¶¶ 57-58 of the Complaint contains the relevant allegations. Paragraph 57 states: "Defendant Aber approached Defendant Slade and Defendant Harris and informed them that he was viewing strip search videos." It then alleges a legal conclusion: "Both Defendant Slade and Defendant Harris recognized that there was no legitimate law enforcement purpose for Defendant Aber (or anyone else) to view strip search videos."[3] Paragraph 58 states neither Slade nor Harris intervened. The Complaint contains no further details; it does not allege when Aber communicated this information to Slade and Harris, and it does not allege Aber provided any explanation as to why he was watching strip-search videos.

---

[3] As discussed below, courts disagree with this legal conclusion.

6

### 1. Existence of a Constitutional Violation by Aber.

The La Plata Defendants focus on the second and third factors of the *Bledsoe* test, and thus assume for purposes of this Motion that the Complaint's allegations establish that Aber violated Plaintiff's constitutional rights in some respect.[4]  The Court should observe, however, that the existence of either a Fourth Amendment or Equal Protection claim against Aber forecloses any substantive due process claim.  *See, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotes omitted) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."); *Huff v. Reeves*, 996 F.3d 1082 (10th Cir. 2021) (same).

### 2. Smith's, Slade's and Harris's Knowledge of that Violation.

The primary question for the Court with respect to the failure-to-intervene claims concerns the meaning of *Bledsoe*'s second factor: whether an officer "observed or had reasons to know about" a constitutional violation.

Prior to *Bledsoe*, the Tenth Circuit recognized the viability of a failure-to-intervene case not involving excessive use of force only once, in *Reid v. Wren*, 57 F.3d 1081, *2 (10th Cir. 1995) (unpublished table decision). Like a typical use of force case, *Reid* involved officers personally present at the time and place of another officer's

---

[4] The La Plata Defendants reserve the right to argue otherwise, and concede this point only for purposes of this Motion.

unconstitutional act—in that case, the seizure of a horse. Thus, the officers eye-witnessed the unconstitutional act.[5]

*Bledsoe* involved not a single unconstitutional act but a lengthy conspiracy between various law enforcement officers to frame plaintiff for a murder they knew he didn't commit. The Tenth Circuit addressed the case under Rule 12(b)(6). The plaintiff, Bledsoe, alleged the officers knew Bledsoe had an alibi, and that his brother had admitted committing the murder. But they systematically conspired over the course of their investigation to cause his brother, who had intellectual impairments, to instead fabricate statements implicating Bledsoe, while failing to disclose to Bledsoe exculpatory evidence of his brother's guilt. DNA evidence ultimately exonerated Bledsoe after he spent 16 years in prison. *See Bledsoe*, 53 F.4th at 595-98. The facts of *Bledsoe* accordingly tend to parallel those of a use of force case where each individual officer not only fails to intervene against another officer, but actively participates in the beating himself.

*Bledsoe* and *Shaw* show that Judges Ebel and Holmes of the Tenth Circuit supported extending failure-to-intervene doctrine outside the use of force context, while Judges Eid, Tymkovich, Hartz and McHugh chose to avoid doing so. This lack of consensus, along with an absence of precedent involving anything other than clear, eye-witness knowledge or involvement in unconstitutional acts, should inspire caution in relying on inference to impute knowledge of unconstitutional conduct when the facts do not clearly support such knowledge.

---

[5] The Tenth Circuit more recently declined to pursue a similar analysis in *Shaw*, 36 F.4th at 1020-21, on qualified immunity grounds.

Precedent from other circuits referenced in *Bledsoe* reinforces this conclusion.  In extending failure-to-intervene doctrine beyond the use of force context, *Bledsoe* cites two cases: *Reid*, and *Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012).  As *Bledsoe* noted, *Livers* itself collects cases from other circuits on the issue.  Since *Bledsoe* relied on those cases for its holding, they shed light on when the doctrine does and does not apply in the Tenth Circuit.

*Livers* involved facts somewhat similar to those in *Bledsoe*.  The plaintiffs there were accused of murder and incarcerated pending trial. The charges rested significantly on a coerced confession from one of the plaintiffs, who was intellectually impaired. Subsequent investigation exonerated plaintiffs, and the criminal charges against them were dismissed after they had been held in custody for some 8 months. The *Livers* court cites *Reid* and cases from the Second, Fourth, and Seventh Circuits as recognizing failure-to-intervene claims outside the excessive force context.  Like *Shaw*, however, *Livers* did not itself do so, instead granting qualified immunity on the basis that clearly established law did not exist on the subject.

The Second Circuit decision that *Livers* cites is *Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994).  Though characterized in *Bledsoe* and *Livers* as a case not involving use of force, the plaintiffs alleged that a trio of DEA agents beat them after an automotive collision, then took them into custody for assaulting federal agents. The government later dropped all charges against the plaintiffs.  They then filed suit, alleging failures to intervene both in the initial use of force and the subsequent arrest.  The Second Circuit concluded the claim for failure to intervene in both contexts could proceed because the

agents were personally present at the relevant times and places: at the scene of the assault, and at the station during booking. *Anderson*, 17 F.3d at 558.

The Seventh Circuit decision that *Livers* cites is *Yang v. Hardin*, 37 F.3d 282, 286 (7th Cir. 1994). The case arrived on appeal after the two defendant officers defaulted; the Seventh Circuit held that the trial court erred in its failure-to-intervene analysis by not treating the allegations of the complaint as true. The complaint alleged that the officers arrived at Yang's store to investigate a burglary, and that in the course of doing so Officer Brown shoplifted merchandise from the store. When Yang confronted Brown, he threw the merchandise at Yang and shoved him. The officers then entered their car to leave. *See id.* at 283-84.

Yang held the drivers' door of the squad car open to prevent their departure. Brown then drove the vehicle, with Yang hanging on to the door, in a reckless manner in an effort to dislodge Yang. While doing so Brown also repeatedly struck Yang in the ribs with his elbow. Throughout these episodes Officer Hardin sat silent and did not intervene. Both officers were prosecuted and convicted of felonies in connection with the incident. *See id.* at 284. The Seventh Circuit concluded the facts alleged sufficed to support a claim for failure to intervene against Hardin. *See id.* at 285-86. This case too, then, involved Hardin eye-witnessing all relevant violations.

The final case *Livers* cites as supporting the application of failure-to-intervene doctrine outside the use of force context is the Fourth Circuit's decision in *Randall v. Prince George's Cty.*, 302 F.3d 188 (4th Cir. 2002). The case arose out of an investigation into the murder of a police officer. The plaintiffs were twelve individuals

questioned by police during the murder investigation. At least nine plaintiffs were, without probable cause, detained at gunpoint and handcuffed to the wall of the police station for questioning.  As relevant here, the defendants included two officers, Swope and Ricker, supervising the murder investigation who the plaintiffs sued on a failure-to-intervene theory. *See id.* at 195-200.

The Fourth Circuit's analysis of Swope's and Ricker's liability focused on their knowledge of the unlawful detentions at issue in the case. Swope and Ricker did not personally detain or question the plaintiffs, nor did they witness either of those events firsthand.  The evidence did show they were present in the station house where the plaintiffs were detained, and may either have heard the plaintiffs protesting their confinement or seen them being transported through the station in handcuffs.  But the court found this evidence insufficient, because numerous other people unrelated to the murder investigation were present in the station house at the same time.  Connecting the group being held involuntarily with the group present for questioning was, the court held, a step that "cannot be satisfied through mere inference." *See id.* at 204-05. Because inference was not a proper basis to impute knowledge of unconstitutional conduct, the Court accordingly held Swope and Ricker had no duty to intervene.

The Fourth Circuit's approach is consistent with this Court's treatment of "observes or has reason to know."  Cases involving personal observation of events within close eyeshot or earshot find a duty to intervene.  Cases involving only potentially inferable knowledge do not.  *See, e.g.*, *McKenzie v. City & Cnty. of Denver,* 2023 WL 5488465, *25 (D. Colo. July 21, 2023) (finding officers who were personally present at

scene of arrest had knowledge, but declining to so find with respect to officer not present); *Mohamed v. Jones*, 2022 WL 523440, *21 (D. Colo. Feb. 22, 2022) (finding officer present outside cell door who heard beating and plaintiff's cries for help had knowledge, despite being unable to see beating); *Hein v. Hersberger*, 2021 WL 1662739, *3-4 (D. Colo. Apr. 28, 2021) (despite evidence that deputy told police officers plaintiff's purse was in her car, court found no evidence deputy had reason to know officers searched car for that purse; thus, no duty to intervene); *Carey v. Buitrago*, 2020 WL 3620324, *10 (D. Colo. Mar. 18, 2020) (plaintiff failed to show that detention deputy who opened cell door had knowledge of assault other officers committed within).

This Court's most thorough discussion of "observes or has reason to know" appears in *Whitson v. Bd. of Cnty. Commissioners of Cnty. of Sedgwick*, 2020 WL 13660757, at *7 (D. Colo. Apr. 17, 2020), *rev'd on other grounds,* 106 F.4th 1063 (10th Cir. 2024). There, Sheriff Hanna of Sedgwick County personally transferred a disabled female inmate, P.B., to another jail in his personal vehicle. During the transfer, he stopped at his home and sexually assaulted P.B. One of his deputies, Neugebauer, observed that Hanna had P.B. change into street clothes before the transport, which Neugebauer recognized was unusual. Then, while driving home for a lunch break, Neugebauer saw Hanna's empty personal vehicle parked at Hanna's house. After lunch, he again saw the empty vehicle parked in the same place. Twelve days later, Neugebauer reported his observations to the District Attorney, who opened an investigation and ultimately charged Hanna with sexual assault.

P.B. sued Neugebauer for failing to intervene. The Court began by noting:

> Mr. Hanna's sexual assault of [P.B.] certainly qualifies as a constitutional violation by another law enforcement official.  And to be sure, if it were alleged here that Deputy Neugebauer observed the actual sexual assault, or that it took place in his presence, the Court would have no trouble concluding that he could be liable. An officer cannot stand idly by while he knows a fellow officer is violating the constitution.  But the Amended Complaint makes no such allegations. Nor does it allege, for example, that Mr. Hanna told Deputy Neugebauer of his unconstitutional plans, or that Deputy Neugebauer knew Sheriff Hanna did such things.

*Id.* at *7 (citation and footnote omitted).

P.B.'s claim against Neugebauer contended that he had "reason to know" Hanna was violating P.B.'s rights.  The Court noted that "while it is certainly established that an officer who knows or is present for another's unconstitutional action has a duty to intervene, when presence or actual knowledge isn't alleged, the question is much more difficult to answer."  *Id.* (citing *Tanner v. San Juan Cnty. Sheriff's Office*, 864 F. Supp. 2d 1090, 1152 (D.N.M. 2012)).   P.B. argued that Neugebauer's personal observations, coupled with his knowledge that transporting inmates in personal vehicles and in street clothes violated policy, gave rise to an inference that Hanna was violating P.B.'s rights.

The Court concluded that the "Tenth Circuit does not appear to have squarely addressed how liability for failure to intervene operates when the officer who allegedly should have intervened does not necessarily have all the information in the possession of the other officer who allegedly acts unlawfully."   *Id.* at *9 (quoting *Tanner*, 864 F. Supp.2d at 1120).  The Court shared the District of New Mexico's conclusion in *Tanner*: that a broad reading of secondary liability "would run afoul of Supreme Court and Tenth Circuit law that an officer should be liable only when his own individual actions violate the constitution."  *Id.* (internal quotes from *Tanner* omitted).  It concluded that "it is easy

to say" in hindsight that "Neugebauer should have investigated more or intervened sooner than he did." *Id.* But in determining whether an officer violated a constitutional duty, courts are required to assess "the situation from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Zia Tr. Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1154 (10th Cir. 2010)).

a. <u>The Complaint Only Alleges Facts Consistent with Proper Conduct.</u>

Plaintiffs now ask the Court in this case to do what it declined to do in *Whitson*, and what the Fourth Circuit declined to do in *Randall*: rest liability for failure to intervene on an unsupported inference. They do so, moreover, where the facts known to the officers are even more consistent with proper conduct than in those two cases.

To begin with, the Complaint includes no allegations at all that Smith observed or had reason to know that Aber was viewing strip-search videos for any purpose, much less a non-penological purpose. Having no such knowledge, he accordingly had no opportunity to intervene.

With respect to Slade and Harris, we return to ¶ 57 of the Complaint. Paragraph 57 alleges: "Defendant Aber approached Defendant Slade and Defendant Harris and informed them that he was viewing strip search videos. Both Defendant Slade and Defendant Harris recognized that there was no legitimate law enforcement purpose for Defendant Aber (or anyone else) to view strip search videos."

The first sentence in paragraph 57 is factual. The second is not. It constitutes a legal conclusion, a "naked assertion devoid of further factual enhancement," or both. *See Iqbal*, 556 U.S. at 678; *see also Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1319

(10th Cir. 2021) (Bacharach, J., concurring) (citing *Iqbal* and *Vega v. Davis*, 572 F. App'x 611, 618-19 (10th Cir. 2014) for proposition that "plaintiffs must do more than allege knowledge; they must allege facts making such knowledge plausible.")  It is, moreover, a legal conclusion with which courts disagree.

Recording correctional institution strip searches is proper, and courts recognize that maintaining records of the searches serves a legitimate penological purpose.  *See, e.g.*, *Jones v. Anderson*, 116 F.4th 669, 677-79 (7th Cir. 2024) (citing *Scott v. Harris*, 550 U.S. 372, 378, 381 (2007) for proposition that appellate courts review recorded facts "in the light depicted by the videotape," and concluding female officer served legitimate penological purpose when recording male inmate's strip search); *Griffin v. Ortiz*, 2025 WL 1071361, *8 (D. Colo. Jan. 6, 2025) ("the Court can easily conclude that a prison could rationally decide to record all strip searches to both protect inmates from sexual abuse by guards during the strip search (because the guards would know that the search was being recorded) and protect the guards from false claims of sexual abuse.")

Another legitimate penological purpose for reviewing the videos is the same reason for conducting the strip-searches: investigating the flow of contraband into the Jail. Assuming for purposes of this Motion that reviewing a video of a search itself constitutes a separate search for Fourth Amendment purposes, "infringements on prisoners' constitutional rights must not be 'arbitrary or irrational,' nor an 'exaggerated response' to security needs."  *Farmer v. Perrill*, 288 F.3d 1254, 1261 (10th Cir. 2002) (citing *Turner v. Safley*, 482 U.S. 78, 90 (1987)).  But "courts have been extremely

deferential to the decisions made by prison administrators, recognizing that running a prison is an inordinately difficult undertaking" committed to other branches of government, and accordingly "separation of powers concerns counsel a policy of judicial restraint." *Id.* (quoting *Turner*, 482 U.S. at 84-85) (internal quotes omitted).

"To analyze a Fourth Amendment claim based on an allegedly unlawful search, we balance the need for the particular search against the invasion of personal rights that the search entails." *Griffith v. El Paso Cty.*, 129 F.4th 790, 824 (10th Cir. 2025). (internal quotes omitted). "In conducting this analysis, we consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

The Complaint does not allege that Slade and Harris knew Aber had personal, prurient motives for viewing strip-search videos. In fact, it omits any details of the conversation—or conversations—between Aber, Slade and Harris. It does not explain when the conversation occurred,[6] or why Aber was watching strip-search videos. And there is no allegation anyone knew what Aber was actually doing until after he resigned. This renders the Complaint a threadbare pleading for purposes of Rule 12(b)(6), as it is equally plausible that: (1) the communication took place before any duty to intervene outside the excessive force context was even in place, and (2) that Aber was reviewing strip-search videos for legitimate penological purposes. *See Iqbal*, 556 U.S. at 679

---

[6] Section 31-21-131 came into effect on June 19, 2020, and the Tenth Circuit did not recognize failure-to-intervene claims outside the excessive force context prior to *Bledsoe* in November of 2022.

(holding that pleader must allege facts that allow the court "to infer more than the mere possibility of misconduct").

The most plausible inference from the threadbare facts alleged here is that Aber *did not* tell fellow law enforcement officers he was watching those videos for anything other than a legitimate penological purpose, as doing otherwise would have invited arrest and termination. *See, e.g.*, *id.* at 680 (noting how *Twombly* rejected a claim resting on allegations that, though consistent with illegal conduct, were "not only compatible with, but indeed [were] more likely explained by" lawful behavior).

And, as the caselaw approving the recording of strip-search videos suggests, subsequently reviewing those videos for investigatory purposes serves a legitimate penological purpose. *See, e.g.*, *Cavalier v. Cnty. of San Diego*, 2015 WL 3843984, *10 (S.D. Cal. May 13, 2015); *see also Sanford v. Corr. Officer Mullins,* No. 19-2255, 2020 U.S. App. LEXIS 29306 (6th Cir. Sep. 15, 2020) (noting review of strip-search video in response to inmate allegations against officer); Fed. R. Crim. P. 41(e)(2)(B) (authorizing subsequent review of electronic evidence seized pursuant to warrant); Colo. R. Crim. P. 41(d)(5)(VII) (same).  Merely alleging Slade and Harris knew Aber was reviewing strip-search videos, without more, is therefore insufficient to nudge Plaintiffs' claims against Slade and Harris over the line to plausibility.

In short, the Complaint seeks to do what *Whitson* and the cases it cites prohibit: impute knowledge obtained from an investigation years later to Slade and Harris at the time Aber informed them he was watching strip-search videos.  Basic principles of law and "linear time" forbid this approach. *See Cordova v. Aragon*, 569 F.3d 1183, 1194

(10th Cir. 2009); *Cruz v. City of Deming*, 138 F.4th 1257, 1266 (10th Cir. 2025) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (courts view circumstances confronting officers "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *Zia Trust Co.*, 597 F.3d at 1154 (same).

Accordingly, Plaintiffs cannot show that either Slade or Harris "observed or had reasons to know about [Aber's] constitutional violation" for purposes of the second failure-to-intervene factor articulated in *Bledsoe*. There being no knowledge, there is no basis to examine *Bledsoe*'s third factor, concerning opportunity to intervene.

The foregoing discussion relates to all of Plaintiffs' claims for failure to intervene. With respect to Claims Six and Thirteen, for alleged failures to intervene in an equal protection violation, the Complaint does not allege that Smith, Slade or Harris knew Aber was primarily viewing female strip-search videos. Again, the Complaint's single factual allegation on this issue is that Aber approached Slade and Harris and "informed them that he was viewing strip search videos." Compl., ¶ 57. It does not specify what videos Aber watched, how many videos Aber watched, or whose videos Aber watched. The absence of any reference to gender-differentiated viewing accordingly provides a further basis to dismiss the claims for failure to intervene in equal protection violations.

## B.    Qualified Immunity Shields Smith, Slade and Harris Against Plaintiffs' § 1983 Claims.

As previously noted, the Complaint includes three § 1983 claims for failure to intervene against Smith, Slade and Harris in their individual capacities. Qualified immunity shields them from these claims.

When a defendant asserts qualified immunity, "the burden shifts to the plaintiff to show: (1) a violation of a constitutional right, and (2) that the right was clearly established." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022). The Court may begin its analysis with either prong "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curium) (quotations omitted). The Supreme Court and Tenth Circuit stress that references to legal principles or general propositions of law are typically insufficient to show that a right is clearly established. See *id.* at 12; see also *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021). Prior law must have significant factual correspondence to the circumstances facing an officer to meet the standard. *See Dist. of Columbia v. Wesby*, 583 U.S. 38, 63 (2018).

"Clarity," in the clearly established law context, requires an "on-point Supreme Court or published Tenth Circuit decision," or "the clearly established weight of authority from other courts [finding] the law to be as the plaintiff maintains." *Est. of Waterhouse v. Direzza,* 129 F.4th 1212, 1225 (10th Cir. 2025). This means the rule must be settled law, dictated by "controlling authority" or "a robust consensus of cases of persuasive authority," *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011) (quotation omitted). Put simply, existing law must have placed the constitutionality of the officer's conduct "beyond debate." *Wesby*, 583 U.S. at 63. This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Id*. (quotation omitted). It is the

plaintiff's burden to provide the authority to establish the law at the time of the alleged constitutional violation. *Thomas v. Durastanti*, 607 F.3d 665, 669 (10th Cir. 2010).

November of 2022 provides a convenient reference point when conducting the qualified immunity analysis in this case, because *Bledsoe* makes clear there could have been no duty to intervene outside the excessive force context prior to that date. The events at issue in the Complaint conclude in July of 2024.  Between November of 2022 and July of 2024, the Tenth Circuit decided no failure-to-intervene cases that even remotely approach "the particular circumstances before" Slade, Harris and Smith here. *See Wesby*, 583 U.S. at 63.  Indeed, to the La Plata Defendants' knowledge, all failure-to-intervene cases decided during that timeframe involved excessive force.

The closest the Tenth Circuit has come to the sorts of claims at issue here appears to have been *Griffith v. El Paso Cty.*, 129 F.4th 790, 825-26 (10th Cir. 2025). That case involved an incarcerated transgender woman's claim that a female deputy had a duty to intervene and prevent a male jail deputy from strip searching her.  The trial court dismissed the failure-to-intervene claim against the female deputy, and the Tenth Circuit affirmed, noting that the plaintiff had failed to explain how excessive force precedent applied to her case.  While the Tenth Circuit treated the argument as waived, *Griffith* does tend to support the conclusion that neither Ms. Griffith's counsel nor any court was aware of clearly-established law mandating a duty to intervene there.

Accordingly, Slade, Harris and Smith are entitled to qualified immunity in connection with the § 1983 claims in the Fourth through Sixth Claims for Relief.

C.      **Plaintiffs Fail to State a *Monell* Claim.**

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978)).  "[I]n other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Id.*  Instead, "the government as an entity" may only be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Id.*

Thus, to establish municipal liability, a plaintiff must first demonstrate a "municipal policy or custom," which may take one of the following forms:  (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.  *See id.*  "[O]ther alleged supervisory shortcomings—for instance, failing to adequately screen job applicants—can also constitute an official policy if the plaintiff meets the stringent "deliberate indifference" standard of fault."  *Id.* at 1284.

After establishing a municipal policy or custom, a plaintiff must demonstrate "a direct causal link between the policy or custom and the injury alleged." *Id.* "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Id.* (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013)).

"Finally, at least for claims of inadequate hiring, training, or other supervisory practices, a plaintiff 'must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" *Id.* (quoting *Brown*, 520 U.S. at 407). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," *id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011) and *Brown*, 520 U.S. at 410)), as "a less stringent standard of fault for a failure-to-train claim would result in de facto respondeat superior liability on municipalities," *Id.* (quoting *Connick*, 563 U.S. at 62).

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir.

1998). "In most instances, notice can be established by proving the existence of a pattern of tortious conduct." *Id.* Deliberate indifference "may be found absent a pattern of unconstitutional behavior only in a narrow range of circumstances where a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Id.* (quoting *Barney*, 143 F.3d at 1307-08, and *Brown*, 520 U.S. at 409).

### 1.  Circuit Authority Rejecting Similar Claims.

The Tenth Circuit has played a leading role in developing the law around officers who engage in plainly improper criminal behavior. In *Barney*, a jailer—Pulsipher—sexually assaulted two female inmates. The inmates alleged failures in hiring and training. The court found no pattern of prior sexual assaults existed at the jail, and concluded the risk that Pulsipher would sexually assault inmates was not obvious because "[s]pecific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior." *Barney*, 143 F.3d at 1308. It held the plaintiffs also failed to show that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* (emphasis in original). It accordingly dismissed plaintiffs' *Monell* claims.

*Barney* quotes the Eighth Circuit's decision in *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996). There, a patrol officer raped a 17-year old girl. Two prior complaints about the officer involved potential sexual misconduct. The court concluded these incidents provided the municipal defendants with notice that "some problems existed" with the officer, but did not indicate a "persistent and widespread pattern of

misconduct that amounts to a city custom or policy." *Id.* at 1076. Like *Barney*, the court rejected a failure to train theory because "[i]n light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women.")

In 2013, the Tenth Circuit cited both *Barney* and *Andrews* when it decided *Schneider*. There, plaintiff M.S. alleged that Officer Coyne of the Grand Junction Police Department ("GJPD") sexually assaulted her, and brought a *Monell* claim against GJPD. She alleged inadequate hiring and training, inadequate investigation of a prior sexual assault complaint against Coyne, and inadequate discipline and supervision. *See id.*

Coyne had two prior allegations of improper sexual contact while working in law enforcement. GJPD did not learn of the first prior to hiring Coyne, because it arose after GJPD had already completed its background check. That incident involved improper sexual contact between Coyne and witnesses during an investigation. *See id.* at 765.[7]

GJPD did know about the second, which involved an allegation that Coyne sexually assaulted a woman he first met while on duty. The District Attorney declined to prosecute because the evidence was equivocal. GJPD placed Coyne on probation, but did not terminate him. He was on probation when he assaulted M.S. *See id.* at 766.

With respect to hiring, the Tenth Circuit concluded the lag between background check and Coyne's start date was reasonable, and did not demonstrate deliberate

---

[7] GJPD also did not learn of an internal investigation at a Florida law enforcement employer which resulted in a finding of "not sustained" for "Conduct unbecoming a public employee" because the Florida organization did not provide its files. *See Schneider*, 717 F.3d at 771.

indifference.  The same was true for failing to obtain the Florida files, which GJPD was told were confidential.  With respect to *Monell* hiring claims, the court emphasized that:

> Cases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause. In the broadest sense, every injury is traceable to a hiring decision. Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.

*Id.* at 772-73 (quoting *Brown*, 520 U.S. at 415).

M.S. also alleged the City failed to adequately train its officers not to have sexual relationships with those they met on duty. The court observed that apart from the complaint for which Coyne himself was on probation, the GJPD knew of only one other report of non-consensual sexual misconduct by a GJPD officer. The court concluded these two incidents "were not enough to make it obvious to GJPD that officers were likely to engage in non-consensual sexual conduct" unless they were so trained.  *Id.* at 774.  Quoting *Barney* and *Andrews*, the court held specific training is not necessary for law enforcement officers to obey the criminal law.

One year later, the Ninth Circuit cited the same passages from *Barney* and *Andrews* in *Flores v. Cty. of Los Angeles,* 758 F.3d 1154, 1160 (9th Cir. 2014), another case involving sexual contact allegations against an officer.  The court added that*:*

> Where the proper response is obvious to all without training or supervision, then the failure to train or supervise is generally not so likely to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise.  Given that the penal code prohibits sexual battery, it is not plausible that inclusion in the Manual of the language that Flores proposes would have prevented the assault on Flores.  If the threat of prison time does not sufficiently deter sexual assault, it is not plausible to assume that a specific instruction not to commit sexual assault will provide such

deterrence, and therefore failure to include such instruction does not constitute deliberate indifference absent a longstanding pattern of such criminal behavior.

*Id.* (internal quotes and cites omitted); *see also Floyd v. Waiters,* 133 F.3d 786 (11th Cir. 1998) (*reinstated after remand*, 171 F.3d 1264 (11th Cir. 1999) (citing *Walker v. City of New York*, 974 F.2d 293, 299-300, 301 (2d Cir.1992) and dismissing *Monell* claim arising out of school security guard's molestation of children because school board "was entitled to rely on the common sense of its employees not to engage in wicked and criminal conduct.")

The Tenth Circuit recently applied these principles in *Brown v. Flowers*, 2023 WL 6861761 (10th Cir. Oct. 18, 2023). The case involved a pretrial detainee's claims arising out of sexual relations she had with a guard. The guard, Flowers, pled guilty to rape of an inmate not involving coercion or force. The Tenth Circuit found B.B. failed to state a *Monell* claim because she provided no evidence that an official policy or custom caused the sexual contact with Flowers, and thus failed to show it was the "moving force" behind her injury. *Id.* at *9. The Court also rejected B.B.'s argument that Flowers' criminal record—which included burglary, forgery, and protection orders—at the time of hiring demonstrated a "close relationship" between the hiring and the statutory rape. And it rejected her arguments that policies and customs were inadequate because those allegations were insufficiently supported. *See id.* at *10; *see also Waller*, 932 F.3d at 1284-1299 (rejecting *Monell* claim and premise that specialized training was required for deputies to know that unprovoked assaults were wrong.)

26

### 2. The Foregoing Decisions Are Dispositive Here.

a. <u>Policy Allegations.</u>

The Complaint here alleges that only personnel with administrative credentials, typically those ranked Lieutenant or above, have access to strip-search videos. *See* Compl., ¶ 35. And it alleges that the system maintains detailed logs showing who logged into the system and what they viewed. *See id.*, ¶ 36. It alleges Aber, as the Jail Commander, had unrestricted access to the videos. *See id.*, ¶¶ 1, 60.

It then alleges a list of failures in supervision and training that it characterizes as customs or policies: failing to implement monitoring or oversight of access to evidence.com; failing to establish policies regarding viewing of strip-search videos; failing to monitor access to strip-search videos; and failing to adequately supervise or train those with access to the videos. *See id.*, ¶¶ 65-70. In effect, these allegations of supposed custom or policy merely amount to critiques of the actual policy previously alleged: limiting access to strip-search videos to those with administrative credentials.

The Tenth Circuit rejected precisely this sort of pleading in *Waller*, finding that it impermissibly required stacking "inference upon inference" to conclude that the Sheriff's custom or practice consisted of endorsing alleged omissions connected to the plaintiff's injury. *See Waller*, 932 F.3d at 1290. Thus, the *Monell* claim here fails at the first step.

b. <u>No Causal Link Between Policy Restricting Access and Injury.</u>

Causation analysis applies with especial rigor to alleged failures in supervision, hiring and training. *See, e.g.*, *Waller*, 932 F.3d at 1284; *Schneider*, 717 F.3d at 770. The Complaint alleges Aber's misuse of strip-search videos was first discovered in

October of 2024.  *See id.,* ¶ 62.  There is no allegation that the Sheriff's Office knew of Aber's—or anyone else's—misuse of strip-search videos prior to then.

To establish the requisite causal link, the plaintiff must demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *See Brown,* 520 U.S. at 404.  The foregoing cases show that the moving force here was not policy failures, but rather Aber's surreptitious misconduct.  The Complaint does not, and cannot, allege that the Sheriff's Office maintained a policy, custom or practice encouraging employees to use strip-search videos for pornographic purposes.  Nor is specialized training required to know that using securely archived strip-search videos as a personal pornography source is wrong.  Instead, as in the cases just discussed, Aber's conduct violated the criminal law and subjected him to prosecution.  *See, e.g.*, § 18-7-801, C.R.S. (2025). The failure to provide specialized training and supervision against all imaginable "wicked and criminal conduct," accordingly cannot be characterized as the moving force behind Plaintiffs' injuries here.

c.  No State of Mind.

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Connick*,

563 U.S. at 62 (quotation omitted). But "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* "Notice of particular deficiencies in a training program is the crux of a failure-to-train theory." *Est. of Lobato by & through Montoya v. Correct Care Sols., LLC*, 2017 WL 1197295, *7 (D. Colo. Mar. 31, 2017).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62.  The Complaint admits that the first the Sheriff's Office heard of strip-search videos being misused was during its investigation into Aber, after his resignation.  It can hardly be charged with foreknowledge of such misconduct sufficient to show it acted with deliberate indifference under such circumstances.[8]

Plaintiffs are left with relying on the fact that Aber was allegedly accused of sexual misconduct prior to his hiring in 2005.  The Complaint alleges that La Plata County and the Sheriff's Office knew Aber "had a history of being accused of sexual impropriety or harassment in connection with his work as a peace officer."  *See id.*, ¶ 38. But it alleges no supporting facts for this conclusory statement of knowledge, and provides no details regarding the outcome of any investigation associated with the alleged accusations.

---

[8] Given that the internet provides access to a bottomless reservoir of pornography with far greater ease than evidence.com—and with no potential for adverse employment, criminal or civil consequences—it is difficult to comprehend why the Sheriff's Office should have foreseen that Aber or anyone else would use the latter as he did.

Aber was hired in 2005, and did not assume the role of Jail Commander until 2018. *See* Compl., ¶ 38. The Complaint makes no allegations of institutional knowledge concerning any of Aber's alleged sexual impropriety between 2005 and the 2024 investigation that gave rise to Aber's resignation.  As previously noted, Plaintiffs cannot simply assert the Sheriff's Office acted with a certain state of mind; they must allege facts sufficient to support the existence of that state of mind. *See supra* at 14 (citing *Iqbal* and *Vega*).  The stale and undefined allegation of accusations made against Aber at some point prior to 2005 is not closely related, temporally or in terms of conduct, to the bizarre behavior Aber engaged in here.

### d.   Aber Was Not a Final Policymaker.

Attempting to avoid the stringent standards governing municipal liability, Plaintiffs claim that Aber was a final policymaker, and thus the Sheriff's Office is directly responsible for his actions.  The Supreme Court instructs that state law governs the determination of who is a final policymaker for purposes of *Monell* liability. *See, e.g.*, *St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality)) ("whether an official had final policymaking authority is a question of state law.")

Pursuant to § 30-10-511, C.R.S., "the sheriff shall have charge and custody of the jails of the county."  This makes him the final policymaker with respect to the jail. *See Whitson v. Bd. of Cty. Comm'rs of the Cty. of Sedgwick,* 106 F.4th 1063, 1068 (10th Cir. 2024).  Plaintiffs allege Aber was a delegated policymaker with final authority over strip-search videos. But they do not, and cannot, allege the requisite factual

foundation for such a conclusion. *See Schneider*, 717 F.3d at 775 n.7 (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 790 (10th Cir. 2010)) ("[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions.") The Court should accordingly reject this feature of their *Monell* claim as well.

## V.  CONCLUSION

The Court should dismiss all claims against the La Plata Defendants with prejudice.


Respectfully submitted this 3rd day of November, 2025.


BERG HILL GREENLEAF RUSCITTI LLP

*s/ Christopher G. Seldin*
_____
David J. Goldfarb
Christopher G. Seldin
Abbey Derechin
1712 Pearl Street
Boulder, CO  80302
Phone:  (303) 402-1600
Fax:  (303) 402-1601
Email:  djg@bhgrlaw.com
          chris.seldin@bhgrlaw.com
          *abbey.derechin@bhgrlaw.com*

*Attorneys for La Plata Defendants*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on this 3rd day of November, 2025, I electronically filed the foregoing **LA PLATA COUNTY DEFENDANTS' MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system which will send notification to such filing to the following e-mail addresses,

Crist Whitney
Felipe S. Bohnet-Gomez
Iris Halpern
Katie W. Valiant
Matthew J. Cron
Omeed M. Azmoudeh
Qusair Mohamedbhai
Siddhartha H. Rathod
Virginia H. Butler
Neil S. Sandhu
Rathod | Mohamedbhai LLC
2701 Lawrence Street, Suite 100
Denver, CO 80205
cw@rmlawyers.com
fbg@rmlawyers.com
ih@rmlawyers.com
kw@rmlawyers.com
mc@rmlawyers.com
oa@rmlawyers.com
qm@rmlawyers.com
sr@rmlawyers.com
vb@rmlawyers.com
ns@rmlawyers.com

John C. Baxter
John C. Baxter, Attorney at Law
1099 Main Avenue, #500
Durango, CO 81301
baxterlaw@gmail.com

M. Austin Mehr
Kevin A. Mehr
Bartley K. Hagerman
Phillip G. Fairbanks
Mehr Fairbanks Trial Lawyers PLLC
201 West Short Street, Suite 800
Lexington, KY 40507
amehr@austinmehr.com
kevin.mehr@mehrlawcolorado.com
bkh@austinmehr.com
pgf@austinmehr.com

Jason M. Kosloski
Kosloski Law, PLLC
1401 Lawrence Street, Suite 1600
Denver, CO 80202
jkosloski@koskoskilaw.com

Tyler A. Jolly
Jolly Law P.L.L.C.
9996 W. U.S.. Highway 50, Unit 1090
Salida, CO 81201
Tyler@JollyLawColorado.com

and I hereby certify that I have mailed or served the document or paper to the following
non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-
participant's name:

Edward Aber
1908 Eastlawn Avenue
Durango, CO 81301
aberej33@gmail.com

*s/ Cheryl Stasiak*

_____

Cheryl Stasiak

4926-8138-7381, v. 2