IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-02531-GPG-KAS
    Consolidated with Civil Action No. 25-cv-02763-GPG-KAS

_____

Civil Action No. 25-cv-02531-GPG-KAS

TERRIANNE PAIGE HIEHLE, in her individual capacity and on behalf of all others similarly situated;
KATRINA LILE, in her individual capacity and on behalf of all others similarly situated; and
KIMBERLI LASHAWAY, in her individual capacity and on behalf of all others similarly situated,

        Plaintiffs,

v.

EDWARD ABER, in his individual capacity and official capacity as Jail Commander of the La Plata County Jail;
LA PLATA COUNTY, COLORADO;
LA PLATA COUNTY SHERIFF'S OFFICE;
SEAN SMITH, in his individual capacity and official capacity as Sheriff of La Plata County;
MICHAEL SLADE, in his individual capacity;
JACOB HARRIS, in his individual capacity; and
JOHN/JANE DOES #1-10, in their individual capacities,

        Defendants.

_____

Civil Action No. 25-cv-02763-GPG-KAS

C.B.;
R.C.;
J.E.;
S.H.;
A.H.;
A.H.;
M.J.;
J.L.;

M.N.;
E.P.;
S.R.;

M.S.;
A.S.;
N.T.;
K.T.;
R.W.;
I.W.; and
J.W., individually and on behalf of all others similarly situated,

     Plaintiffs,

v.

EDWARD ABER, in his individual and official capacity as Jail Commander of
the La Plata County Jail;
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LA PLATA;
JACOB HARRIS, in his individual capacity;
MICHAEL SLADE, in his individual capacity; and
SEAN SMITH, in his official capacity as Sheriff of La Plata County,

     Defendants.

_____

## LA PLATA COUNTY DEFENDANTS' MOTION TO DISMISS
_____

Defendants Board of County Commissioners of La Plata County, Sean Smith in his official capacity, Michael Slade and Jacob Harris (collectively, the "La Plata Defendants") respectfully file the following Motion to Dismiss the First Amended Class Action Complaint and Jury Demand ("Complaint") filed by C.B. et al. in consolidated action No. 25-cv-02763-GPG-KAS (Dkt. No. 84).[1]

_____

[1] **Certificate of Conferral:** Pursuant to D.C.Colo.LCivR 7.1A, undersigned counsel for the La Plata Defendants conferred with Neil Sandhu, Esq. and Felipe Bohnet-Gomez, Esq., who indicated Plaintiffs oppose the relief requested herein. Consistent with

## I.    INTRODUCTION

The Complaint in this case alleges surreptitious acts of voyeurism that Defendant Edward Aber engaged in for his own sexual gratification. The Complaint does not, and cannot, plausibly allege that Aber's job description or duties included such acts, or that any official policy or custom condoned them. Nor does it allege La Plata County Sheriff Sean Smith or any other final County policymaker had any knowledge or notice that Aber was reviewing strip-search videos at all, much less for improper purposes. With respect to Deputy Slade, no cause of action for failure to intervene existed at the time of Slade's alleged omissions. And with respect to Deputy Harris, the Complaint fails to allege he knew Aber was reviewing strip-search videos for non-penological purposes. The Complaint therefore fails to state claims against any of the La Plata Defendants.

## II.    FACTS ALLEGED IN COMPLAINT

Inmates entering the La Plata County Detention Facility (the "Jail") undergo a strip search during the booking process.[2] *See* Complaint, ¶ 32. The strip search is filmed, and footage is uploaded to evidence.com. *See id.*, ¶ 33. The searches, and the filming thereof, are used to detect contraband, preserve evidence, and provide a record in the event concerns arise about a search. *See id.*, ¶ 97. Access to the videos is restricted to those holding the rank of Lieutenant or above. *See id.,* ¶ 100.

---

D.C.COLO.MJ V-9, the parties engaged in a substantive conferral concerning the issues argued herein, including discussion of the potential for amendments to address them.

[2] The La Plata Defendants disagree with many of the Complaint's allegations, and recite them here only for purposes of this Motion in accordance with Rule 12.

Aber joined the Sheriff's Office in 2005, after serving on the Durango Police Department ("DPD") from 1997-2005. *See id.*, ¶¶ 51, 59. During his tenure with DPD, he was "credibly accused" of sexual harassment. *See id.*, ¶¶ 53, 58. The Complaint does not describe the alleged misconduct, when it happened, or the outcome of any investigation related to it. After this accusation, DPD promoted Aber multiple times. *See id.,* ¶ 56. The Complaint alleges Sheriff Smith knew about this accusation due to his friendship with Aber. *See id.*, ¶ 55. But it does not allege Smith was Sheriff when the Sheriff's Office hired Aber.  Nor does it allege how anyone at the Sheriff's Office at the time of hiring knew about the DPD allegations. *See id.*, ¶ 53.

"Between 2005 and 2024, Commander Aber developed a well-known reputation for suspicious behavior, impropriety with inmates, and sexual misconduct." *Id.*, ¶ 60. The Complaint does not specify who had knowledge of this reputation. The Complaint alleges unspecified acts were reported to the Sheriff, were or should have been observed by the Sheriff when conducting oversight responsibilities and were openly discussed by Jail staff. *See id.*, ¶ 80. But the only specific reports pled were from female employees in 2024. These reports triggered a detailed investigation that revealed Aber's misuse of strip-search videos. *See id.*, ¶¶ 169-175.

Aber became Jail Commander in 2018 and had supervisory authority over the Jail and its personnel. *See id.*, ¶¶ 82-83. His role as Commander gave him access to inmate strip-search videos. *See id.*, ¶ 83. Aber repeatedly accessed and viewed strip search-videos through evidence.com for "his own perverted ends." *See id.*, ¶¶ 105-106. While doing so, he took screenshots of certain inmates' anatomy. *See id.,* ¶ 118.

4

The Complaint alleges Sheriff Smith had supervisory authority over Aber, and that he was responsible for establishing and enforcing policies and procedures governing jail operations. *See id.*, ¶¶ 19, 22. It alleges Smith promoted Aber to Jail Commander in 2018, and that at unspecified times he hired two other deputies who he should have known had previously been accused of sexual harassment. *See id.*, ¶¶ 65, 43, 47. Otherwise, the Complaint refers to Smith only as an "Institutional Defendant" who failed to put in place various policies that Plaintiffs argue may have prevented Aber's misconduct. *See, e.g., id.*, ¶¶ 136-142.

The Complaint sets forth factual allegations concerning Deputies Slade and Harris in paragraphs 122 to 135. It alleges Aber approached Slade in 2018 to discuss contraband, and directed Slade to watch female strip-search videos to evaluate how contraband was entering the Jail, which Slade declined to do. *See id.*, ¶ 125-26. The only allegation concerning Slade after 2018 is that he reported this 2018 interaction to Harris in 2021. *See id.* at ¶ 129. With respect to Harris, the Complaint alleges Aber approached him in 2023, had the same conversation he previously had with Slade, and asked Harris to watch male strip-search videos. It then alleges—without specifying how or why—that Slade and Harris knew or should have known about Aber's improprieties, and that they failed to report Aber to a superior. *See id.*, ¶¶ 134-35.

## III.    STANDARD OF REVIEW

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these

allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quotation omitted). A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019) (applying *Iqbal* to § 1983 claims).

## IV.    ARGUMENT

### A.    Neither Federal nor State Law Imposed a Duty to Intervene on the Individual Defendants.

The Fifth through Eighth, and Sixteenth through Nineteenth, Claims for Relief all assert claims for failure to intervene against Slade and Harris. The Fifth through Eighth arise under 42 U.S.C. § 1983. The Thirteenth through Fifteenth arise under § 13-21-131, C.R.S. ("§ 131"), and mirror the federal claims filed under § 1983.[3] The Colorado Court of Appeals holds that federal § 1983 decisions provide persuasive authority in § 131 cases. *See Woodall v. Godfrey,* 553 P.3d 249, 256 (Colo. App. 2024); *see also Shash v. City of Pueblo*, 770 F. Supp. 3d 1279, 1308 (D. Colo. 2025). Section 131 does not apply retroactively. *See Casper v. Olson,* 2022 WL 22924503, *5 (Colo. App. Apr. 7, 2022); *see also* S.B. 20-217, § 18 (act takes effect on passage).

---

[3] Plaintiffs name the Sheriff and Board as defendants in all of their § 131 claims. Based on a conferral with Plaintiffs, the La Plata Defendants understand these claims to involve the Sheriff and Board only insofar as such claims may entail indemnification. Direct § 131 claims against the Sheriff and Board are improper under *Ditirro v. Sando*, 520 P.3d 1203 (Colo. App. 2022).

"A plaintiff states a constitutional violation in the form of failure to intervene by alleging that (1) a government officer violated his constitutional rights, (2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and (3) the defendant had a realistic opportunity to intervene, but failed to do so." *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022). Prior to *Bledsoe* in November 2022, the only published Tenth Circuit decisions recognizing failure-to-intervene claims involved excessive use of force.  *See id.* at 617.

Slade's relevant conduct took place in 2018. *See* Complaint, ¶¶ 124-128. Section 131 did not exist in 2018 and does not apply retroactively. *See Olson*, 2022 WL 22924503, *5. And there was no federal duty to intervene outside the excessive force context prior to November, 2022. *See Bledsoe*, 53 F.4th at 617. On these grounds alone, the Court should dismiss all § 1983 and § 131 claims against Slade.

Aber told Slade and Harris to review strip-search videos to evaluate how contraband entered the Jail. *See* Complaint, ¶ 125. Plaintiffs allege Slade and Harris should have intuited that Aber's stated purpose was a ruse, and that he instead planned to use those videos for his own personal pornographic ends. They rest this contention on allegations that Slade and Harris "knew or should have known" that Aber engaged in misconduct with female employees and inmates. They do not allege either Slade or Harris actually had such knowledge, much less how they came by it. Nor do they allege Slade or Harris knew Aber was misusing the videos.

### 1. Slade's and Harris's Knowledge of a Violation.

The La Plata Defendants focus in this Motion on the second *Bledsoe* factor: whether an officer "observed or had reasons to know about" a constitutional violation.[4] Prior to *Bledsoe*, the Tenth Circuit recognized a failure-to-intervene case not involving excessive use of force only once, in *Reid v. Wren*, 57 F.3d 1081, *2 (10th Cir. 1995) (unpublished table decision). Like a typical use of force case, *Reid* involved officers personally present at the time and place of another officer's unconstitutional act—in that case, the seizure of a horse. Thus, the officers eye-witnessed the unconstitutional act.[5]

*Bledsoe* involved a lengthy conspiracy between various law enforcement officers to frame the plaintiff for murder. Plaintiff, Bledsoe, alleged the officers knew Bledsoe had an alibi, and that his brother admitted committing the murder. But they conspired to fabricate statements implicating Bledsoe while failing to disclose exculpatory evidence. DNA evidence exonerated Bledsoe after he spent 16 years in prison. *See Bledsoe*, 53 F.4th at 595-98. *Bledsoe* accordingly parallels use of force cases where each officer not only fails to intervene but actively participates in the beating himself.

*Bledsoe* and *Shaw* show the Tenth Circuit lacks consensus with respect to extending failure to intervene claims to cases not involving use of force. At a minimum,

---

[4] For purposes of the first factor, Defendants note that substantive due process claims are unavailable. *See, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotes omitted) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."); *Huff v. Reeves*, 996 F.3d 1082 (10th Cir. 2021) (same).

[5] The Tenth Circuit more recently declined to pursue a similar analysis in *Shaw v. Schulte*, 36 F.4th 1006, 1020-21, on qualified immunity grounds.

8

precedent upon which *Bledsoe* relies suggests these claims should not rest on inferred knowledge. *Bledsoe* cites two cases to extend failure-to-intervene doctrine beyond the use of force context: *Reid*, and *Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012). *Livers* itself collects cases from other circuits on the issue. Since *Bledsoe* references those cases as well, they too shed light on when the doctrine does and does not apply.

*Livers* involved plaintiffs accused of murder and incarcerated pending trial. The charges rested significantly on a coerced confession. Subsequent investigation exonerated plaintiffs. The charges against them were dismissed after they had been in custody for 8 months. *Livers* observed *Reid* and cases from the Second, Fourth, and Seventh Circuits recognized failure-to-intervene claims not involving excessive force. Like *Shaw*, however, *Livers* did not itself do so, instead granting qualified immunity.

The Second Circuit decision that *Livers* cites is *Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994). Though *Bledsoe* and *Livers* characterize it as not involving use of force, the plaintiffs alleged a trio of DEA agents beat them after a collision, then took them into custody for assaulting federal agents. The government later dropped all charges. Plaintiffs alleged failures to intervene both in the initial use of force and the subsequent arrest. The Second Circuit concluded the failure to intervene claim could proceed in both contexts because the agents were personally present at relevant times and places: the scene of the assault, and the station during booking. *See Anderson*, 17 F.3d at 558.

The Seventh Circuit decision that *Livers* cites is *Yang v. Hardin*, 37 F.3d 282, 286 (7th Cir. 1994). The complaint alleged two officers arrived at Yang's store to investigate a burglary, and that Officer Brown shoplifted merchandise from the store during the

9

investigation. When Yang confronted Brown, he threw the merchandise at Yang and shoved him. The officers then entered their car to leave. *See id.* at 283-84. Yang held the drivers' door of the squad car open to prevent their departure. Brown then drove the vehicle with Yang hanging on to the door in an effort to dislodge Yang. While doing so Brown also repeatedly struck Yang in the ribs with his elbow. Officer Hardin eye-witnessed these episodes but did not intervene. The Seventh Circuit concluded these facts supported a failure to intervene claim against Hardin. *See id.* at 285-86.

The final case *Livers* cites is *Randall v. Prince George's Cty.*, 302 F.3d 188 (4th Cir. 2002). The case arose out of an investigation into the murder of a police officer. Plaintiffs were twelve individuals questioned by police during the investigation. At least nine plaintiffs were, without probable cause, detained at gunpoint and handcuffed to the wall of the police station for questioning. Plaintiffs sued two officers supervising the investigation, Swope and Ricker, for failure to intervene. *See id.* at 195-200.

The Fourth Circuit focused on Swope's and Ricker's knowledge of the unlawful detentions at issue. Swope and Ricker did not personally detain or question the plaintiffs, nor did they witness either of those events firsthand. The evidence placed them at the station house where plaintiffs were detained, and they may either have heard plaintiffs protesting their confinement or seen plaintiffs being transported through the station in handcuffs. But the Court found this evidence insufficient, as numerous people unrelated to the investigation were also in the station house at the time. Connecting the group held involuntarily with the group present for questioning was, the court held, a step that "cannot be satisfied through mere inference." *See id.* at 204-05.

Because inference was not a proper basis to impute knowledge of unconstitutional conduct, the Court held Swope and Ricker had no duty to intervene.

The Fourth Circuit's approach is consistent with this Court's treatment of "observes or has reason to know." Cases involving personal observation of events within close eyeshot or earshot find a duty to intervene. Cases involving only potentially inferable knowledge do not. *See, e.g., McKenzie v. City & Cnty. of Denver,* 2023 WL 5488465, *25 (D. Colo. July 21, 2023) (finding officers personally present at arrest had knowledge, but declining to so find with respect to officer not present); *Mohamed v. Jones*, 2022 WL 523440, *21 (D. Colo. Feb. 22, 2022) (officer present outside cell door who heard but did not see beating and cries for help had knowledge); *Hein v. Hersberger*, 2021 WL 1662739, *3-4 (D. Colo. Apr. 28, 2021) (deputy who told police officers plaintiff's purse was in her car had no reason to know officers actually searched car for that purse; thus, no duty to intervene); *Carey v. Buitrago*, 2020 WL 3620324, *10 (D. Colo. Mar. 18, 2020) (plaintiff failed to show detention deputy who opened cell door had knowledge of assault other officers committed within).

This Court's most thorough discussion of "observes or has reason to know" appears in *Whitson v. Bd. of Cnty. Commissioners of Cnty. of Sedgwick*, 2020 WL 13660757, at *7 (D. Colo. Apr. 17, 2020), *rev'd on other grounds,* 106 F.4th 1063 (10th Cir. 2024). There, Sheriff Hanna of Sedgwick County personally transferred a disabled female inmate, P.B., to another jail in his personal vehicle. During the transfer, he stopped at his home and sexually assaulted P.B. One of his deputies, Neugebauer, observed that Hanna had P.B. change into street clothes before the transport, which

11

Neugebauer recognized was unusual. Then, while driving home for a lunch break, Neugebauer saw Hanna's empty personal vehicle parked at Hanna's house. After lunch, he again saw the empty vehicle parked in the same place. Twelve days later, Neugebauer reported his observations to the District Attorney, who opened an investigation and ultimately charged Hanna with sexual assault. P.B. sued Neugebauer for failing to intervene. The Court began by noting:

> Mr. Hanna's sexual assault of [P.B.] certainly qualifies as a constitutional violation by another law enforcement official. And to be sure, if it were alleged here that Deputy Neugebauer observed the actual sexual assault, or that it took place in his presence, the Court would have no trouble concluding that he could be liable. An officer cannot stand idly by while he knows a fellow officer is violating the constitution. But the Amended Complaint makes no such allegations. Nor does it allege, for example, that Mr. Hanna told Deputy Neugebauer of his unconstitutional plans, or that Deputy Neugebauer knew Sheriff Hanna did such things.

*Id.* at *7 (citation and footnote omitted).

P.B. claimed Neugebauer had "reason to know" Hanna was violating P.B.'s rights. The Court noted that "while it is certainly established that an officer who knows or is present for another's unconstitutional action has a duty to intervene, when presence or actual knowledge isn't alleged, the question is much more difficult to answer." *Id.* P.B. argued Neugebauer's personal observations, coupled with his knowledge that transporting inmates in personal vehicles and in street clothes violated policy, gave rise to an inference that Hanna was violating P.B.'s rights.

The Court noted the "Tenth Circuit does not appear to have squarely addressed how liability for failure to intervene operates when the officer who allegedly should have intervened does not necessarily have all the information in the possession of the other

12

officer who allegedly acts unlawfully." *Id.* at *9. The Court concluded a broad reading of secondary liability "would run afoul of Supreme Court and Tenth Circuit law that an officer should be liable only when his own individual actions violate the constitution." *Id.* "[I]t is easy to say" in hindsight that "Neugebauer should have investigated more or intervened sooner than he did." *Id.* But in determining whether an officer violated a constitutional duty, courts are required to assess "the situation from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Zia Tr. Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1154 (10th Cir. 2010)).

a. <u>The Complaint Only Alleges Facts Consistent with Proper Conduct.</u>

Plaintiffs ask the Court to do what *Whitson* and *Randall* did not: rest liability for failure to intervene on an unsupported inference. The Complaint alleges Aber told Slade and Harris to watch strip-search videos to investigate how contraband was entering the Jail. *See* Complaint, ¶¶ 124-125. It then alleges they should have disregarded their superior, concluded Aber planned to use strip-search videos for personal pornographic reasons, and reported him. Why? Because they "should have known" that Aber had engaged in misconduct with females. *See id.*, ¶ 134. The Complaint does not allege they actually knew of this misconduct, or even how they should have known of this misconduct. This fact-free approach to pleading knowledge does not suffice. *See Iqbal*, 556 U.S. at 678; *see also Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1319 (10th Cir. 2021) (Bacharach, J., concurring) (citing *Iqbal* and *Vega v. Davis*, 572 F. App'x 611, 618-19 (10th Cir. 2014) for proposition that "plaintiffs must do more than allege knowledge; they must allege facts making such knowledge plausible.")

13

Recording correctional institution strip searches, and maintaining the recordings, serve legitimate penological purposes. *See, e.g.*, *Jones v. Anderson*, 116 F.4th 669, 677-79 (7th Cir. 2024) (female officer served legitimate penological purpose when recording male inmate's strip search); *Griffin v. Ortiz*, 2025 WL 1071361, *8 (D. Colo. Jan. 6, 2025) ("the Court can easily conclude that a prison could rationally decide to record all strip searches to both protect inmates from sexual abuse by guards during the strip search (because the guards would know that the search was being recorded) and protect the guards from false claims of sexual abuse.")

Another legitimate penological purpose for reviewing the videos is the same reason for conducting the strip-searches: investigating the flow of contraband into the Jail. Assuming for purposes of this Motion that reviewing a video of a search itself constitutes a separate search for Fourth Amendment purposes, "infringements on prisoners' constitutional rights must not be 'arbitrary or irrational,' nor an 'exaggerated response' to security needs." *Farmer v. Perrill*, 288 F.3d 1254, 1261 (10th Cir. 2002) (citing *Turner v. Safley*, 482 U.S. 78, 90 (1987)). But "courts have been extremely deferential to the decisions made by prison administrators, recognizing that running a prison is an inordinately difficult undertaking" committed to other branches of government, and accordingly "separation of powers concerns counsel a policy of judicial restraint." *Id.* (quoting *Turner*, 482 U.S. at 84-85) (internal quotes omitted).

As the caselaw approving the recording of strip-search videos suggests, subsequently reviewing those videos for investigatory purposes serves a legitimate penological purpose. *See, e.g.*, *Cavalier v. Cnty. of San Diego*, 2015 WL 3843984, *10

14

(S.D. Cal. May 13, 2015); *see also Sanford v. Corr. Officer Mullins,* No. 19-2255, 2020 U.S. App. LEXIS 29306 (6th Cir. Sep. 15, 2020) (noting review of strip-search video in response to inmate allegations against officer); Fed. R. Crim. P. 41(e)(2)(B) (authorizing subsequent review of electronic evidence seized pursuant to warrant).

The Complaint here seeks to do what *Whitson* and the cases it cites prohibit: impute knowledge obtained from an investigation years later to Slade and Harris at the time Aber informed them he was watching strip-search videos. Plaintiffs do not allege the incidents Slade and Harris "should have known" about were reported until 2024. *See* Complaint, ¶¶ 165-166. Only after the Sheriff's Office launched an investigation and forensically analyzed Aber's computer in October of 2024 did anyone learn Aber was viewing strip-search videos for prurient personal reasons. *See id.*, ¶ 171.

Accordingly, Plaintiffs cannot show that either Slade or Harris "observed or had reasons to know about [Aber's] constitutional violation" for purposes of the second failure-to-intervene factor articulated in *Bledsoe*. There being no knowledge, there is no basis to examine *Bledsoe*'s third factor, concerning opportunity to intervene.[6]

**B.    Qualified Immunity Shields Slade and Harris Against Plaintiffs' § 1983 Claims.**

---

[6] The foregoing discussion relates to all of Plaintiffs' claims for failure to intervene. With respect to Claims Eight and Nineteen, for alleged failures to intervene in equal protection violations, the Complaint does not allege that Slade or Harris knew Aber had targeted review only of female strip-search videos. To the contrary, Aber instructed Slade and Harris to review the males while he reviewed the females. Slade and Harris accordingly had no knowledge of gender-differentiated viewing. This provides a further basis to dismiss the claims for failure to intervene in equal protection violations.

When a defendant asserts qualified immunity, "the burden shifts to the plaintiff to show: (1) a violation of a constitutional right, and (2) that the right was clearly established." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). General legal principles or propositions do not show a right is clearly established. *See id.* at 12; *see also Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021). Instead, there must be significant factual correspondence. *See Zorn v. Linton*, 2026 WL 795469 (U.S. 2026); *Dist. of Columbia v. Wesby*, 583 U.S. 38, 63 (2018).

"Clearly established law" requires an "on-point Supreme Court or published Tenth Circuit decision," or "the clearly established weight of authority from other courts." *Est. of Waterhouse v. Direzza,* 129 F.4th 1212, 1225 (10th Cir. 2025). Put simply, existing law must have placed the constitutionality of the officer's conduct "beyond debate." *Wesby*, 583 U.S. at 63. This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Id*. (quotation omitted).

November of 2022 provides a convenient reference point in this case, because there was no duty to intervene outside the excessive force context prior to *Bledsoe*. The events at issue in the Complaint conclude in July of 2024. Between November of 2022 and July of 2024, the Tenth Circuit decided no failure-to-intervene cases that even remotely approach "the particular circumstances before" Harris. *See Wesby*, 583 U.S. at 63. To the La Plata Defendants' knowledge, all failure-to-intervene cases decided during that timeframe involved excessive force. As for Slade, there are no relevant

16

allegations post-dating 2018, well before even *Bledsoe*. Thus, Slade and Harris are also entitled to qualified immunity on the federal claims.

**C.    Plaintiffs Fail to State a *Monell* Claim.**

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978)). "[I]n other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* Governmental entities may only be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.*

To establish entity liability, a plaintiff must first demonstrate a "policy or custom" which may include, as relevant here: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *See id.* "[O]ther alleged . . . shortcomings—for instance, failing to adequately screen job applicants—can also constitute an official policy if the plaintiff meets the stringent 'deliberate indifference' standard of fault." *Id.* at 1284.

After establishing a municipal policy or custom, a plaintiff must demonstrate "a direct causal link between the policy or custom and the injury alleged." *Id.* "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless

has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Id.* (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013)).

"Finally, at least for claims of inadequate hiring, training, or other supervisory practices, a plaintiff 'must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" *Id.* (quoting *Brown,* 520 U.S. at 407). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," i*d.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011) and *Brown*, 520 U.S. at 410)), as "a less stringent standard of fault for a failure-to-train claim would result in de facto respondeat superior liability on municipalities," *Id.* (quoting *Connick*, 563 U.S. at 62).

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). "In most instances, notice can be established by proving the existence of a pattern of tortious conduct." *Id.* Deliberate indifference "may be found absent a pattern of unconstitutional behavior only in a narrow range of circumstances where a violation

18

of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Id.*

### 1.  Circuit Authority Rejecting Similar Claims.

The Tenth Circuit has led development of the law around officers who engage in criminal behavior for personal ends. In *Barney*, a jailer—Pulsipher—sexually assaulted two female inmates. The inmates alleged failures in hiring and training. The court found no pattern of prior sexual assaults existed at the jail and concluded the risk that Pulsipher would sexually assault inmates was not obvious because "[s]pecific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior." *Barney*, 143 F.3d at 1308. It held the plaintiffs also failed to show that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* (emphasis in original). It accordingly dismissed plaintiffs' *Monell* claims.

*Barney* quotes the Eighth Circuit's decision in *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996). There, a patrol officer raped a 17-year-old girl. Two prior complaints about the officer involved potential sexual misconduct. The court concluded these incidents provided the municipal defendants with notice that "some problems existed" with the officer but did not indicate a "persistent and widespread pattern of misconduct that amounts to a city custom or policy." *Id.* at 1076. Like *Barney*, the court rejected a failure to train theory because "[i]n light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women.")

In 2013, the Tenth Circuit cited both *Barney* and *Andrews* when it decided *Schneider*. There, plaintiff M.S. alleged that Officer Coyne of the Grand Junction Police Department ("GJPD") sexually assaulted her and brought a *Monell* claim against GJPD. She alleged inadequate hiring and training, inadequate investigation of a prior sexual assault complaint against Coyne, and inadequate discipline and supervision. *See id.*

The Tenth Circuit concluded GJPD's failure to obtain all relevant background materials prior to hiring Coyne was reasonable. The court emphasized that:

> Cases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause. In the broadest sense, every injury is traceable to a hiring decision. Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.

*Id.* at 772-73 (quoting *Brown*, 520 U.S. at 415). M.S. also alleged the City failed to adequately train its officers not to have sexual relationships with those they met on duty. The court observed that apart from a complaint involving Coyne himself, the GJPD knew of only one other report of non-consensual sexual misconduct by a GJPD officer. The court concluded these two incidents "were not enough to make it obvious to GJPD that officers were likely to engage in non-consensual sexual conduct" unless they were so trained. *Id.* at 774. Quoting *Barney* and *Andrews*, the court held specific training is not necessary for law enforcement officers to obey the criminal law.

One year later, the Ninth Circuit cited the same passages from *Barney* and *Andrews* in *Flores v. Cty. of Los Angeles,* 758 F.3d 1154, 1160 (9th Cir. 2014), another case involving sexual contact allegations against an officer. The court added that*:*

20

> Where the proper response is obvious to all without training or supervision, then the failure to train or supervise is generally not so likely to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise. . . . [T]he penal code prohibits sexual battery . . . . If the threat of prison time does not sufficiently deter sexual assault, it is not plausible to assume that a specific instruction not to commit sexual assault will provide such deterrence, and therefore failure to include such instruction does not constitute deliberate indifference absent a longstanding pattern of such criminal behavior.

*Id.* (internal quotes and cites omitted); *see also Floyd v. Waiters*, 171 F.3d 1264 (11th Cir. 1999) (reinstating 133 F.3d 786, 796) (citing *Walker v. City of New York*, 974 F.2d 293, 299-300, 301 (2d Cir.1992) and dismissing *Monell* claim arising out of school security guard's molestation of children because school board "was entitled to rely on the common sense of its employees not to engage in wicked and criminal conduct.")

The Tenth Circuit recently applied these principles in *Brown v. Flowers*, 2023 WL 6861761 (10th Cir. Oct. 18, 2023). The case involved a pretrial detainee's claims arising out of sexual relations she had with a guard. The guard, Flowers, pled guilty to rape of an inmate not involving coercion or force. The Tenth Circuit found B.B. failed to state a *Monell* claim because she provided no evidence that an official policy or custom caused the sexual contact with Flowers and thus failed to show it was the "moving force" behind her injury. *Id.* at *9. The Court also rejected B.B.'s argument that Flowers' criminal record—which included burglary, forgery, and protection orders—at the time of hiring demonstrated a "close relationship" between the hiring and the statutory rape. And it rejected her arguments that policies and customs were inadequate because those allegations were insufficiently supported. *See id.* at *10; *see also Waller*, 932 F.3d at

1284-1299 (rejecting *Monell* claim and premise that specialized training was required for deputies to know that unprovoked assaults were wrong.)

   a.  Policy Allegations Here.

The Complaint alleges that only personnel ranked Lieutenant or above have access to strip-search videos. *See* Complaint, ¶ 100. The system maintains detailed logs showing who logged into the system and what they viewed. *See id.*, ¶ 102.

The Complaint alleges failures in supervision, monitoring and training that it characterizes as customs or policies: failing to implement monitoring or oversight of access to evidence.com; failing to establish policies regarding viewing of strip-search videos; failing to monitor access to those videos; and failing to adequately supervise or train those with access to the videos. *See id.*, ¶¶ 137-164. In effect, these allegations of supposed custom or policy merely amount to critiques of the actual policy previously alleged: limiting access to strip-search videos to those with administrative credentials.

*Waller* rejected precisely this sort of pleading, finding it impermissibly requires stacking "inference upon inference" to conclude a custom or practice consists of endorsing omissions connected to a plaintiff's injury. *See Waller*, 932 F.3d at 1290.

Presumably recognizing these problems, Plaintiffs amended here to allege that the Sheriff maintains a policy of deliberately hiring and protecting sexual harassers. *See* Complaint ¶¶ 36-50. They base these allegations on the opinion of an unnamed DPD officer, citing: (1) two decisions to hire deputies previously accused of sexual harassment, and (2) a decision not to investigate the DPD officer's allegation of harassment against a deputy. These allegations are undated. They do not specify how

22

many years passed between them, or what proportion of the Sheriff's Department's overall employment base these deficient hires comprised. And Plaintiffs allege no consequences: no allegations of sexual harassment against the hires, no civil suits, no criminal charges, no investigations. Instead, all Plaintiffs point to is Aber's misconduct.

These allegations fail the governing test, which requires something "so permanent and well settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). They include no mention of time at all, much less a contention that intentionally hiring sexual harassers is a permanent and well settled La Plata policy. Nor do the allegations support a conclusion the custom is widespread: it alleges only two hires over an unspecified period of time, and one undated allegation of harassment that allegedly went uninvestigated.

This contention that the Sheriff actively condoned sexually assaultive or harassing conduct crumbles under the weight of the detailed facts Plaintiffs do allege: those relating to the Sheriff's investigation of Aber.  The Sheriff's response to reports of Aber's harassing behavior was to promptly launch a detailed investigation that resulted in Aber's resignation and, ultimately, criminal prosecution.  As pled, once complainants came forward, the Sheriff's Office conducted a thorough investigation evidencing zero tolerance for sexual misconduct. *See* Complaint, ¶¶ 165-175. Indeed, were it not for the vigor and thoroughness with which the Sheriff's Office approached the investigation, Aber's misuse of strip search videos never would have come to light. Plaintiffs are literally suing the Sheriff whose investigation unearthed Aber's misconduct in the first place. The Complaint's details about what led to the investigation into Aber's

harassment and the investigation's results contradicts Plaintiff's concocted policy narrative in all respects, and the Court should reject Plaintiffs' vague allegations of a contrary policy as implausible.  Thus, the *Monell* claim here fails at the first step.

### b.    No Direct Causal Link Between Policy and Injury.

Causation analysis applies with especial rigor to alleged failures in supervision, hiring and training. *See, e.g.*, *Waller*, 932 F.3d at 1284; *Schneider*, 717 F.3d at 770. The Complaint alleges Aber's misuse of strip-search videos was first discovered in October of 2024. *See* Complaint, ¶ 157. There is no allegation that the Sheriff's Office knew of Aber's—or anyone else's—misuse of strip-search videos prior to then.

To establish the requisite causal link, the plaintiff must demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *See Brown,* 520 U.S. at 404. The foregoing cases show that the moving force here was not policy failures, but rather Aber's surreptitious misconduct. The Complaint does not, and cannot, allege that the Sheriff's Office maintained a policy, custom or practice encouraging employees to use strip-search videos for pornographic purposes. Nor is specialized training required to know that using securely archived strip-search videos as a personal pornography source is wrong. Instead, as in the cases just discussed, Aber's conduct violated the criminal law and subjected him to prosecution. *See, e.g.*, § 18-7-801, C.R.S. (2025). The failure to provide specialized training against all imaginable "wicked and criminal conduct," was not the moving force behind Plaintiffs' injuries here.

Moreover, the policies that Plaintiffs allege should have been in place relate not to impeding sexual misconduct, but instead to closer monitoring of information

24

technology resources like evidence.com. *See* Complaint, ¶ 149(a)-(i). Even if hiring persons accused of sexual misconduct were a basis for a finding of deliberate indifference, the connection to IT monitoring is tenuous and unexplained. *See Lee v. Poudre Sch. Dist. R-1*, 135 F.4th 924, 935 (10th Cir. 2025) (dismissing *Monell* claim because even if a practice could be "in harmony" with "what happened here, under our rigorous causation standard," a plaintiff must still plausibly allege that particular practice was "the moving force of their alleged injury.")

    c. <u>No State of Mind.</u>

 "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Connick*, 563 U.S. at 62 (quotation omitted). But "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* "Notice of particular deficiencies in a training program is the crux of a failure-to-train theory." *Est. of Lobato by & through Montoya v. Correct Care Sols., LLC*, 2017 WL 1197295, *7 (D. Colo. Mar. 31, 2017).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62. The Complaint admits that the first the Sheriff's Office heard of strip-search videos being misused was during its investigation into Aber in October of 2024, after Aber's resignation. Complaint, ¶¶ 171-75. It can hardly be charged with foreknowledge of such misconduct sufficient to show it acted with deliberate indifference under such circumstances.[7]

Plaintiffs are left with relying on the fact that Aber was allegedly accused of sexual misconduct prior to his hiring in 2005. The Complaint alleges that Sheriff Smith knew Aber "was reported for sexual harassment" while working with the DPD. *See id.*, ¶ 38. But it does not allege Smith was Sheriff at the time, or that he hired Aber. Nor does it allege facts supporting any La Plata County entity's knowledge of Aber's history or plead any details regarding the outcome of any associated DPD investigation. The only plausible inference from the facts actually pled is that the DPD found the allegations unfounded, as it repeatedly promoted Aber thereafter. *See* Complaint, ¶ 56.

As for the Complaint's allegation that the Sheriff has a "policy" of hiring sexual harassers and a culture of condoning sexual harassment, apart from Aber there are no allegations of *any* violations, much less sexual misconduct violations. And the one response to sexual misconduct actually pled in detail shows a thorough investigation resulting in criminal charges. *See* Complaint, ¶¶ 169-75. This is a far cry from the

---

[7] Given that the internet provides access to a bottomless reservoir of pornography with far greater ease than evidence.com—and with no potential for adverse employment, criminal or civil consequences—it is difficult to comprehend why the Sheriff's Office should have foreseen that Aber or anyone else would use the latter as he did.

factual link necessary to plead this theory or a prior "pattern" of factually analogous conduct that might give rise to even an inference of entity-level deliberate indifference to the harm Plaintiffs complain of now. *See Waller*, 932 F.3d at 1287.

Aber was hired in 2005 and did not assume the role of Jail Commander until 2018. *See* Compl., ¶¶ 59, 82. The Complaint makes conclusory allegations of institutional knowledge concerning Aber's alleged sexual impropriety between 2005 and the 2024 investigation that gave rise to Aber's resignation, but it provides no details to support such allegations of knowledge. As previously noted, Plaintiffs cannot simply *assert* Defendants acted with a certain state of mind; they must allege *facts* sufficient to support the existence of that state of mind. *See supra* at 13 (citing *Iqbal* and *Vega*). The stale and undefined allegation of accusations made against Aber when he was with the DPD at some point prior to 2005 is not closely related, temporally or in terms of conduct, to the bizarre behavior Aber engaged in here.

### 2. The Board is Not a Proper Defendant.

Plaintiffs sue both Sheriff Sean Smith in his official capacity and the Board of County Commissioners. Sheriff Smith is the proper official defendant as he is the final policymaker for the Jail. *See* § 30-10-511, C.R.S. (2025) ("the sheriff shall have charge and custody of the jails of the county.") The Board is not. The Complaint contains no allegations differentiating its conduct from the Sheriff's or explaining how it controlled the Sheriff's actions. The Court should dismiss the Board. *See, e.g., Lockhart v. Van Beek*, 2025 WL 661789, *7 (D. Colo. Feb. 28, 2025); *Est. of Angelo v. Bd. of Cnty. Commissioners of Jefferson Cnty.,* 2024 WL 2274080, *18 (D. Colo. May 20, 2024).

**D.    Plaintiffs' Tort Claims Fail Against the La Plata Defendants.**

Amendments to the Complaint added three tort claims in the Twentieth through Twenty-Second Claims for Relief. The first two allege invasion of privacy and seek to hold the Sheriff and Board liable under principles of respondeat superior. The Twenty-Second Claim for Relief alleges negligent operation of a jail against all Defendants.

To hold an employer liable under *respondeat superior*, the employee's tortious conduct must fall within the scope of his or her employment. *See, e.g.*, *Coomer v. Salem Media of Colorado, Inc.,* 565 P.3d 1133, 1152 (Colo. App. 2025). Intentional torts like invasion of privacy typically fall outside the scope of employment, so employers generally may not be held vicariously liable for such torts.  *See id.*[8]

"*Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo. 1993), describes the governing Colorado scope-of-employment standard." *Arroyo v. Privett*, 2024 WL 4129820, *5 (10th Cir. Sept. 10, 2024). "*Moses* sets out Colorado's two-pronged test for determining whether an employee's alleged intentional tort is within the scope of employment: the employee must (1) be 'doing the work assigned ... by [the] employer, or what is necessarily incidental to that work, or customary in the employer's business' *and* (2) have the 'intent in committing the tortious act ... to further the employer's business.'" *Id.* at *5 (quoting *Moses*, 863 P.2d at 329–30, 329 n.27) (italics in *Arroyo*).

*Arroyo* observed that "*Moses* itself teaches that the scope-of-employment inquiry is . . . nuanced." *Id.* "There, the Colorado Supreme Court concluded that a priest acted outside the scope of his employment when he engaged in sexual acts with a

---

[8] As *Coomer* notes, rare exceptions to this rule do exist, such as assaults committed by a bouncer at a bar.

parishioner, even though the sexual acts occurred during the course of counseling, which *was* within the scope of the priest's employment." *Id.* (citing *Moses*, 863 P.2d at 330) (italics in *Arroyo*). In effect, "the priest in *Moses* abandoned his legitimate counseling work by engaging in sexual conduct with a parishioner." *Id.*

Requiring inmate strip searches, recording those strip searches and subsequently reviewing those recordings for correctional purposes was within the scope of Aber's employment and furthered the business of a correctional institution. Reviewing those recordings for personal sexual gratification was neither. *Moses* remains good law and is highly analogous. The Court accordingly should dismiss the Twentieth and Twenty-First Claims for Relief against the Sheriff and Board. The same logic also applies to the Twenty-Second Claim for Relief's *respondeat superior* claim.

The Twenty-Second Claim for Relief first asserts Slade and Harris negligently failed to intervene in Aber's viewing of strip search videos for personal purposes. Again, however, Plaintiffs have not pled that Slade and Harris had any knowledge that Aber was misusing his access to the videos. Nor does the Complaint allege either Slade or Harris actually knew of Aber's reputation or misconduct. Thus, Plaintiffs have failed to plausibly allege Slade and Harris knew Aber was reviewing videos for non-penological purposes. Failing to intervene in proper conduct is not negligent; it is "consistent with non-tortious conduct" and therefore not actionable under Rule 12. *Warne v. Hall,* 373 P.3d 588, 596 (Colo. 2016) (citing *Iqbal* and *Twombly*).

Slade and Harris are also immune because the facts alleged required discretionary acts from them to conclude Aber's conduct was suspicious. Colorado

recognizes a common-law immunity for public officials exercising discretionary functions in good-faith. *See Trimble v. City & County of Denver*, 697 P.2d 716, 728-29 (Colo. 1985). This immunity supplements the statutory immunity that the Colorado Governmental Immunity Act ("CGIA") confers. *See* C.R.S. § 24-10-118(4) ("immunities provided for in this article shall be in addition to any common-law immunity . . . .")

The doctrine provides public officials, including peace officers, with immunity for (1) discretionary acts; (2) which were neither "malicious" in nature nor acts that such official knew would "cause illegal injury" – i.e., when the official acted in good faith. *Trimble*, 697 P.2d at 728-29 (Colo. 1985). This common law immunity seeks to encourage public officials in the administration of their duties, and to protect them from litigation for good-faith decisions made while performing them. *See, e.g., Flournoy v. McComas*, 488 P.2d 1104, 1106 (Colo. 1971).

It specifically applies in failure-to-intervene cases. *Leake v. Cain*, 720 P.2d 152, 163-64 (Colo. 1986), involved police officers accused of negligently failing to arrest a drunk driver.[9] There, patrol officers detained an intoxicated teen at a party. The teen's sober brother promised to drive him home, so the officers released him to the brother. The teen subsequently drove and committed vehicular homicide. Noting that public officials whose conduct is "not willful, malicious or intended to cause harm" are "protected against civil liability," the court concluded the officers exercised discretion and were immune. *See id. Leake* likewise requires dismissing Slade and Harris here.

---

[9] *Leake* post-dates the 1972 adoption of the CGIA. *See* C.R.S. § 24-10-102.

30

The Twenty-Second Claim for Relief rests on the CGIA's waiver of sovereign immunity in an action for injuries resulting from a public entity's "operation" of any jail. *See* § 24-10-106(1)(b).[10] The CGIA defines "operation" in § 24-10-103(3)(a). That term encompasses "only defendants' acts or omissions in exercising the powers, duties, and functions vested in them by law *with respect to the purpose of the facility*. Accordingly, by the plain language of the CGIA, sovereign immunity is waived *only* if the activity at issue relates to the facility's purpose." *Pack v. Ark. Valley Corr. Facility*, 894 P.2d 34, 37 (Colo. App. 1995) (italics in *Pack*).

Citing *Pack* and *Flores v. Colo. Dep't of Corrections*, 3 P.3d 464, 466 (Colo. App. 2000), the Tenth Circuit in *Craven v. Univ. of Colo. Hosp. Auth.*, 260 F.3d 1218, 1231 (10th Cir. 2001), noted that "the purpose of a correctional facility is to manage convicts safely and effectively." *Craven* cited these decisions for a "subtle" point: "the alleged injury underlying the action must be directly related to the purpose, as distinct from the operation . . . of the § 106(1)(b) facility before the court will find that the State's sovereign immunity has been waived." *Id. Craven* then held that personnel actions undertaken by a hospital "only remotely related" to the hospital's primary purpose of providing medical or surgical care. *Craven*, 260 F.3d at 1232. Accordingly, the CGIA did not waive immunity. The Colorado Court of Appeals has reached similar rulings in several cases. *See, e.g.*, *Hardy-Roy v. Univ. of Colo.*, 2023 Colo. App. LEXIS 2760 (App. Dec. 28, 2023) (recordkeeping only an ancillary purpose of a hospital, so no

---

[10] It accordingly implicates the Court's subject matter jurisdiction. The La Plata Defendants reserve the right to challenge under Rule 12(b)(1) claims brought by any plaintiffs who were serving a sentence. *See* § 24-10-106(1.5)(a).

waiver of immunity); *Awad v. Breeze*, 129 P.3d 1039 (Colo. App. 2005) (defamatory acts by physicians did not relate to the primary purpose of a hospital—providing medical or surgical care to sick or injured persons—so no waiver of immunity); *Daley v. Univ. of Colo. Health Scis. Ctr.*, 111 P.3d 554 (Colo. App. 2005) (same with respect to improperly obtaining and circulating the plaintiff's medical records).

Collectively, these decisions demonstrate that the mere fact that an activity is undertaken by public employees at a facility subject to a waiver of immunity does not end the analysis. Instead, the challenged activity at issue must relate directly to the facility's primary purpose. Aber's alleged activities here do not qualify even as ancillary. They are, instead, purely personal acts unrelated to managing inmates safely and effectively. There being no waiver of immunity, Plaintiffs' negligence claims against the Sheriff and the Board for operation of a jail accordingly must be dismissed.

## V. CONCLUSION

The Court should dismiss all claims against the La Plata Defendants with prejudice.

Respectfully submitted this 27th day of March, 2026.

BERG HILL GREENLEAF RUSCITTI LLP

*s/ Christopher G. Seldin*
David J. Goldfarb
Christopher G. Seldin
1712 Pearl Street
Boulder, CO  80302
Phone:  (303) 402-1600
Fax:  (303) 402-1601
Email:  djg@bhgrlaw.com
         chris.seldin@bhgrlaw.com
*Attorneys for La Plata Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2026, I electronically served the foregoing **LA PLATA COUNTY DEFENDANTS' MOTION TO DISMISS** to the following e-mail addresses:

Crist Whitney
Felipe S. Bohnet-Gomez
Iris Halpern
Katie W. Valiant
Matthew J. Cron
Omeed M. Azmoudeh
Qusair Mohamedbhai
Siddhartha H. Rathod
Virginia H. Butler
Neil S. Sandhu
Aria Vaughan
Rathod | Mohamedbhai LLC
2701 Lawrence Street, Suite 100
Denver, CO 80205
cw@rmlawyers.com
fbg@rmlawyers.com
ih@rmlawyers.com
kw@rmlawyers.com
mc@rmlawyers.com
oa@rmlawyers.com
qm@rmlawyers.com
sr@rmlawyers.com
vb@rmlawyers.com
ns@rmlawyers.com
av@rmlawyers.com

John C. Baxter
John C. Baxter, Attorney at Law
1099 Main Avenue, #500
Durango, CO 81301
baxterlaw@gmail.com

M. Austin Mehr
Kevin A. Mehr
Bartley K. Hagerman
Phillip G. Fairbanks
Mehr Fairbanks Trial Lawyers PLLC
201 West Short Street, Suite 800
Lexington, KY 40507
amehr@austinmehr.com
kevin.mehr@mehrlawcolorado.com
bkh@austinmehr.com
pgf@austinmehr.com

Jason M. Kosloski
Kosloski Law, PLLC
1401 Lawrence Street, Suite 1600
Denver, CO 80202
jkosloski@koskloskilaw.com

Tyler A. Jolly
Jolly Law P.L.L.C.
9996 W. U.S. Highway 50, Unit 1090
Salida, CO 81201
Tyler@JollyLawColorado.com

William T. O'Connell
Mackenzie M. Novak
Christy N. Redmond
Thompson, Coe, Cousins & Irons, LLP
1700 Broadway, Suite 900
Denver, CO 80290
woconnell@thompsoncoe.com
mnovak@thompsoncoe.com
credmond@thompsoncoe.com

*s/ Jessica Vecchio*
Jessica Vecchio

33