**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-02531-GPG-KAS
    *Consolidated with Civil Action No. 25-cv-02763-GPG-KAS*

TERRIANNE PAIGE HIEHLE, in her individual capacity
and on behalf of all others similarly situated, et al.,

Plaintiffs,

v.

EDWARD ABER, in his individual and official capacities as
Jail Commander of the La Plata County Jail, et al.,

Defendants.

_____

**PLAINTIFFS' RESPONSE TO LA PLATA COUNTY DEFENDANTS' MOTION TO
DISMISS**
_____

Plaintiffs respectfully ask the Court to deny the Motion to Dismiss filed by

Defendants Board of County Commissioners of La Plata County, Sheriff Sean Smith

acting in his official capacity, Michael Slade, and Jacob Harris (collectively, the "La Plata

County Defendants" or "County Defendants").

.

## LEGAL STANDARD

"[G]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Clinton v. Security Benefit Life. Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quotation omitted, alterations in original). There is therefore a "low bar for surviving a motion to dismiss." *Quintana* v. *Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020). Namely, the Court should accept all allegations as true and resolve all inferences in Plaintiffs' favor. "[O]nly if it appears the plaintiff can prove no set of facts which entitle [them] to relief on [their] claim" should the Court grant the motion to dismiss. *TV Comm'ns. Network, Inc. v. TNT, Inc.*, 964 F.2d 1022, 1024 (10th Cir. 1992).

## ARGUMENT

### I.     The FAC plausibly alleges claims under section 1983 for failure to intervene against Defendants Slade and Harris (Claims 5–8).

For decades, courts have held officers like Sergeant Slade and Lieutenant Harris, who are "given the badge of authority of a police officer[,] may not ignore the duty imposed by [their] office and fail to stop other officers who summarily punish a third person in [their] presence or otherwise within his knowledge. . . . Any rule to the contrary would permit officers to ignore their duty to enforce the law." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002) (quoting *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972)).

"A plaintiff states a constitutional violation in the form of failure to intervene by alleging that 1) a government officer violated his constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so." *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022). Plaintiffs' allegations clear this bar.

1

**A.     Commander Aber violated the constitution.**

To their credit, Plaintiffs do not contest that Commander Aber's conduct violated the constitution. (Motion, p. 8 (stating that they "focus in this Motion on the second *Bledsoe* factor")).

In any case, Commander Aber's conduct was unconstitutional, including his:

- **Cross-gender viewing of strip searches.** As early as 1982, the Tenth Circuit recognized that cross-gender viewing of strip searches (e.g., male guards watching female inmates) was likely unconstitutional. *See Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982) (holding that a district court erred in dismissing plaintiff's claim that "male inmates were subject to a 'certain amount of viewing' by female guards," as that conduct could amount to a cognizable constitutional claim). "[T]here are serious privacy concerns when prison officials view, or search, undressed inmates of the opposite gender." *Griffith v. El Paso Cnty., CO*, 129 F.4th 790, 826–37 (10th Cir. 2025) (collecting cases across circuits that held cross-gender nude viewing was unconstitutional) (internal quotations omitted)). Therefore, a single instance of cross-gender viewing of a nude inmate can amount to a constitutional violation, if it is not justified by exigent circumstances. *Hayes v. Marriot*, 70 F.3d 1144, 1147 (10th Cir. 1995).

- **Watching any strip search videos for sexual gratification.** To the extent they are permitted at all, strip searches may be conducted "only to the extent necessary to further the correction system's legitimate goals and policies." *Cumbey*, 684 F.2d at 714. Satisfying Commander Aber's sexual urges does not "further the correctional system's legitimate goals and policies."

**B.     Defendants Slade and Harris knew since 2018 and 2021, respectively, that Commander Aber was violating the Constitution.**

Angling to dismiss the motion-to-intervene claims against Defendants Slade and Harris, County Defendants argue that Defendants Slade and Harris did not actually know Commander Aber was violating the Constitution, (Motion, pp. 11–13); that they can be held liable only if they are physically present for or participate in the constitutional violation, (Motion, pp. 8–13); and that Defendants Slade and Harris's observed conduct that was consistent only with proper conduct, (Motion, pp. 13–15). None hold water.

1.     The FAC establishes Defendants Slade and Harris's actual knowledge.

2

County Defendants assume that Defendants Slade and Harris did not *actually* know about Commander Aber's misconduct. (Motion, p. 13 (incorrectly claiming the FAC "does not allege they actually knew of this misconduct, or even how they should have known of this misconduct.")). County Defendants are flatly wrong—the FAC details the circumstances in which Defendants Slade and Harris learned about Commander Aber's misconduct, and concludes that based on those circumstances, Defendants Slade and Harris actually "knew" about Commander Aber's misconduct but failed to intervene.

To establish that Defendants Slade and Harris actually knew about Commander Aber's abuse, the FAC must plead "*both* . . . facts from which the inference could be drawn that" they knew about Commander Aber's misconduct, "*and [that the defendant] dr[e]w the inference*." *Waters v. City of Altus, Okla.*, 2025 WL 2814018, at *3 (10th Cir. 2025) (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1029 (10th Cir. 2020) (emphasis in original)). The Tenth Circuit recently explained the difference between conclusory allegations of knowledge (which need not be accepted), and factual allegations (which must be accepted): it is insufficient for a plaintiff to simply allege that a defendant "knew" facts, but if a plaintiff describes *how* defendant learned of the information, their allegations are sufficient. *E.W. v. Health Net Life Ins. Co*, 86 F.4th 1265, 1289–90 (10th Cir. 2023). As Judge Bacharach succinctly put it, a plaintiff who simply pleads *"defendants 'knew'"* certain facts puts forth a conclusory allegation; but a plaintiff who explains *"how* [and] *when* the defendants had learned of the underlying fact," provide sufficient factual background to support a claim of actual knowledge. *See Crane v. Utah Dep't of Corrs*, 15 F.4th 1296, 1319 (10th Cir. 2021) (Bacharach, J., concurring) (emphasis in original).

3

The FAC's descriptions clear this low bar because it describes *when* and *how* Defendants Slade and Harris learned that Commander Aber was abusing his access to the female strip-search videos.

The FAC alleges that Sergeant Slade witnessed Commander Aber inviting female inmates into his office without turning his body-worn camera on, which Sergeant Slade knew was inappropriate behavior. (FAC, ¶¶ 122–23). The reasonable inference is that Sergeant Slade knew Commander Aber had a history of crossing sex-based protocols with female inmates. The FAC alleges that Commander Aber asked Sergeant Slade to watch old strip search videos of female inmates; Sergeant Slade recognized that request was inappropriate because he and Commander Aber were males, he was not a high enough rank to watch the videos, and watching the videos served no penological purpose because watching old videos would not help discover any contraband. (*Id*. at ¶¶ 124–28). When Seargent Slade raised concerns that it would be inappropriate for a male to watch the female strip search videos, Commander Aber told him he would be watching them—yet Seargent Slade did not intervene to stop him from viewing strip search videos of the opposite gender. Based on these circumstances, the FAC concludes that Seargent Slade *actually* "knew . . . that Commander Aber was abusing his access to the strip search videos." (*Id*. at ¶¶ 134–35). Which the FAC defined to include watching cross-gender strip searches without a legitimate law enforcement function and watching the videos for his own sexual gratification. (*Id*. at ¶¶ 104–21).

The FAC alleges that Sergeant Slade told Lieutenant Harris about Commander Aber's request and decision to watch the female strip search videos in 2021. (*Id*. at ¶ 129). The FAC further alleges that Commander Aber similarly asked Lieutenant Harris to

4

watch strip search videos, that Lieutenant Harris expressed concerns about being a male and watching the female strip search videos, and that Commander Aber responded that he would continue to watch the female strip search videos—yet Lieutenant Harris did not intervene to stop him from viewing strip search videos of the opposite gender. (*Id*. at ¶¶ 130–33). Based on these circumstances, the FAC concludes that Lieutenant Harris *actually* "knew" of Aber's unlawful conduct, (*id*. at ¶¶ 134–35), including watching cross-gender strip searches without a legitimate law enforcement function, and watching the videos for his own sexual gratification, (*id*. at ¶¶ 104–21).

Given these detailed allegations, the Court at this motion-to-dismiss stage must accept that since 2018 and 2021 respectively, Defendants Slade and Harris knew that Commander Aber was continually abusing access to the strip search videos to (1) view cross-gender strip searches without a legitimate law enforcement function and (2) view any strip search video for his own sexual gratification.

2.    <u>Physical presence is not required.</u>

County Defendants argue they should be liable for failing to intervene only if they are physically present for the abuse. (Motion, pp. 8–13). Under their proposal, defendants who are told about abuse, but are not physically present for the abuse, should get off scot-free. No such loophole exists.

In the Tenth Circuit, "[a] plaintiff states a constitutional violation in the form of failure to intervene by alleging that . . . (the defendant) observed *or had reasons to know about that constitutional violation* . . . ." *Bledsoe*, 53 F.4th at 616 (emphasis added). In *Bledsoe* itself, no single defendant was present for all of the underlying unconstitutional acts. For example, the plaintiff provided "the fewest specific allegations" against a particular supervisory defendant, but the court agreed with the district court that "it's reasonable to

infer that the officers working on the investigation shared information throughout its course, and, ultimately, worked together to accomplish the alleged constitutional deprivations." *Id*. at 611. Based on that inference that the someone shared information with the supervisor (rather than him being physically present to observe it), the Tenth Circuit held that "the general allegation that Herrig supervised the officers who did undertake more specific unlawful actions supports an inference that he knew about and participated in the conspiracy to frame Bledsoe, and simultaneously failed to intervene." *Id*. at 611–612. Ultimately, the fact that the *Bledsoe* complaint "alleged that each Appellant knew of the ongoing constitutional deprivations" was enough to satisfy the knowledge element and sustain a failure-to-intervene claim. *Id*. at 616.

Despite *Bledsoe*'s express language and holding that knowledge is enough, Defendants Slade and Harris string cite cases, which they insist require that the defendant be physically present for a violation in order to be held liable for failing to intervene. Defendants' misreading of caselaw can be separated into two buckets:

*First*, County Defendants rely on *Bledsoe* and similar cases to argue that law enforcement officers have a duty to intervene only if the violation occurs "in their presence." *Bledsoe*, 53 F.4th at 611; (Motion, pp. 9–10 (citing *Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994); *Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994))). These cases held that when a defendant personally observed a constitutional violation, the knowledge element of the failure-to-intervene claim is satisfied. But that just means that physical presence is one way to satisfy *Bledsoe*'s "observed or had reasons to know" element; it does not mean that physical present is the *only* way to satisfy that element. In fact, like *Bledsoe*, the two other cases cited by Defendants recognize the "knowledge" element is

6

satisfied so long as the officer actually knows the violation occurred, regardless of whether they were personally present for the violation. *See Anderson*, 17 F.3d at 557 (knowledge element satisfied when "officer observes or has reason to know" of violation"); *Yang*, 37 F.3d at 286 (officer is liable if they "had reason to know" of a violation).

*Second*, Defendants cite cases that rejected a failure-to-intervene claim when the defendant was not physically present. Defendants focus most heavily on *Whitson v. Board of County Commissioners of County of Sedgwick*, which began by recognizing that "[a]n officer cannot stand idly by while he knows a fellow officer is violating the constitution. 2020 WL 13660757, at *7 (D. Colo. Apr. 17, 2020) (*rev'd and remanded* 106 F.4th 1063 (10th Cir. 2024)). In the end, *Whitson* rejected liability because the complaint did not allege "that Mr. Hanna told Deputy Neugebauer of his unconstitutional plans, or that Deputy Neugebauer knew Sheriff Hanna did such things." *Whitson* ultimately held that if there is no allegation that the officer observed the violation or otherwise had "actual knowledge," there can be no claim. *Id*. at *7. Rather than requiring personal observation or physical presence, *Whitson* reaffirms that actual knowledge is sufficient, just that it was not present in that case. Likewise, in the rest of the cases Defendants cite, the court found no violation because the defendant was not physically present *and* because they did not otherwise have knowledge of the violation.[1]

---

[1] *Randall v. Prince George's Cty.*, 302 F.3d 188, 204–05 (4th Cir. 2002) (inquiring into the defendant's *knowledge*, not simply whether they were inside or outside the room, and concluding that there can be no liability without personal knowledge); *McKenzie v. City and Cnty. of Denver*, 2023 WL 5488465, at *24–26 (D. Colo. July 21, 2023) (rejecting claims against certain officers against whom it was not alleged they personally observed or otherwise knew of a violation); *Hein v. Hersberger*, 2021 WL 1662739, at *2–3 (D. Colo. April 28, 2021) (finding no violation because no evidence that officer encouraged search, without addressing whether knowledge alone could sustain failure-to-intervene claim); *Carey v. Buitrago*, 2020 WL 3620324, at *10 (D. Colo. Mar. 18, 2020) (rejecting a claim

7

Read properly, the cases County Defendants cite hold that actual knowledge is sufficient to sustain a failure to intervene claim. In *McKenzie v. City and County of Denver*, the court recognized that officers could be liable for failing to intervene because "whether or not each of the arresting officers actually knew of the others' excessive force, they had reason to know of it." 2023 WL 5488465 at *25 (D. Colo. July 21, 2023); *Mohamed v. Jones*, 2022 WL 523440, *21 (D. Colo. Feb. 22, 2022) (recognizing that "the Tenth Circuit has instructed that an official may be liable for a failure to intervene where the official 'observes or *has reason to know*' that a constitutional violation is being committed and fails to intercede" (emphasis in original)); *Carey v. Buitrago*, 2020 WL 3620324, at *10 (D. Colo. Mar. 18, 2020) (same).

Pleading "actual knowledge" is enough to sustain claims against Defendants Slade and Harris for failing to intervene; it is immaterial that they were not physically present or personally observed Commander Aber's abuse of the strip search videos.

3.    Commander Aber's conduct was not consistent with lawful behavior.

County Defendants next argue that for all Defendants Slade and Harris knew, Commander Aber's conduct was consistent with proper conduct. (Motion, pp. 13–15). In support, County Defendants cite cases in which the defendants observed their colleagues lawfully conducting, recording, and viewing strip searches. (*Id.*). But that strip searches might be lawful in *some* cases does not mean they were lawful in *this* case. And in this case, the FAC adequately alleges that Defendants Slade and Harris knew that Commander Aber was conducting strip searches that violated the constitution. *First*, Commander Aber explicitly told them he was watching cross-gender strip search videos,

---

because there was no allegation that "he *knew*" there was a constitutional violation) (emphasis added).

which is necessarily a constitutional violation. *See supra*, Section I.B.1. *Second*, the FAC describes *how* and *when* Defendants Slade and Harris learned of facts that would have permitted them to make the inference that Commander Aber was watching these videos for his own sexual gratification, and concludes that Defendants Slade and Harris did in fact make that inference. (FAC, ¶ 134 (explaining the circumstances witnessed by Slade and Harris that lead them to conclude that Commander Aber was acting for his own sexual gratification)). Their knowledge, as alleged, is not consistent with lawful conduct.

\*       \*       \*

At the motion to dismiss stage, Plaintiffs are not required to plead every single detail of Defendants Slade and Harris's knowledge. Indeed, "requiring a plaintiff to know all of the exact details of his claim is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Acosta v. Jani-King of Okla.*, 905 F.3d 1156, 1161 (10th Cir. 2018) (quotations omitted). By pleading how and when Defendants Slade and Harris learned about Commander Aber's misconduct, Plaintiffs have established their actual knowledge for purposes of the motion to dismiss.

## C.      Defendants Slade and Harris could but did not intervene against Commander Aber's misconduct.

Again, Defendants do not dispute that they had an opportunity to intervene against Commander Aber but failed to do so. (Motion, p. 8 (stating that they "focus in this Motion on the second *Bledsoe* factor")). At any rate, Plaintiffs have plausibly alleged this factor.

"The determination of whether a defendant had a realistic opportunity to intervene is typically an issue of fact, which cannot be resolved on a motion to dismiss." *McKenzie*, 2023 WL 5488465, at \*25 (cleaned up). "Whether an officer had a realistic opportunity to

9

intervene often turns on whether the officer had time to intervene." *Berry v. Beauvais*, 2015 WL 1509725, at *5 (D. Colo. Mar. 30, 2015). Courts find an adequate opportunity to intervene when abuse lasts for under a minute. *Id*. Even when a "complaint fails to *explicitly* specify the existence of an opportunity for [an officer] to have intervened," circuit courts hold the allegations sufficient if the allegations reveal "opportunities during which [officers] could have acted," such as when facts show they "could have called for a backup, called for help, or at least cautioned [the offender] to stop." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

The FAC reveals ample opportunity to intervene. Defendants Slade and Harris learned of Commander Aber's abuse in 2018 and 2021 respectively. (FAC, ¶¶ 122–135). They knew Commander Aber's abuse continued until 2024, when he resigned. (*Id*. at ¶¶ 132 (stating that Commander Aber told Defendant Harris that he would "continue" to watch the female strip search videos; *see also* 170)). Despite having several years of opportunity to intercede, "Sergeant Slade and Lieutenant Harris did not report the abnormal viewing to a superior, and they did not intervene to stop Commander Aber from abusing his access to the videos." (FAC, ¶ 135).

### D.    Defendants Slade and Harris violated clearly established law.

The qualified immunity "analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Reavis v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) (quotations omitted). "General statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question." *Id.* (cleaned up). "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their

10

alleged conduct was unconstitutional." *Id.* (cleaned up).

In analyzing qualified immunity for failure-to-intervene claims, the Tenth Circuit has already concluded that general statements of law provide fair warning of the failure-to-intervene principle. For example, the Tenth Circuit has held it is "clearly established" that an officer who (1) knows that an officer is using excessive force, and (2) has an opportunity to intervene, had a duty to intervene. *Fogarty v. Gallegos*, 523 F.3d 1147, 1163 (10th Cir. 2008); *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996) (same) As demonstrated in *Fogarty*, the Tenth Circuit conducts this analysis, and denies qualified immunity, by relying on this more general principle, and not by analyzing the individual factual similarities or dissimilarities between cases. *Id.*; *Mick*, 76 F.3d at 1136 (holding it clearly established that "a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983," and rejecting qualified immunity without scavenging for cases with similar facts).

*Bledsoe* expanded the scope of this clearly established law, holding "that a failure-to-intervene claim is not limited to excessive force violations, but can involve other underlying constitutional violations." 53 F.4th at 617. Therefore, since November 15, 2022, it has been "clearly established that a law enforcement official has an affirmative duty to intervene to prevent another law enforcement official's [constitutional violations]." *Mick*, 76 F.3d at 1136.

In analyzing whether County Defendants violated clearly established law in this case, the Court should follow the same analysis that the Tenth Circuit embraced in *Fogarty* and *Mick*. Namely, rather than engage in a scavenger hunt for prior cases with precisely the same facts, the Court should analyze whether (1) Defendants Slade and

11

Harris knew that Commander Aber was abusing his access to the strip search videos, and (2) had an opportunity to intervene, but did not. *See Fogarty*, 523 F.3d at 1164; *Mick*, 76 F.3d at 1136. As explained above, the FAC plausibly alleges these elements against Defendants Harris and Slade, and it therefore establishes that they violated clearly established law.

Even if it were not clearly established by precedent, the duty to intervene in the situation alleged here would have been obvious to any objectively reasonable law enforcement officer. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Multiple district courts within the Tenth Circuit have recently rejected qualified immunity by relying on *Hope*'s "obviousness" standard, holding "that it would have been obvious to any objectively reasonable officer that they had a duty to intervene and stop the constitutional violations" in cases involving fabrication of evidence. *Warren v. Unified Gov't of Wyandotte Cnty.*, 2026 WL 1213830, at *18 (D. Kans. May 4, 2026); *Atchison v. City of Tulsa, Okla.*, 2025 WL 2444597, at *11 (N.D. Okla. Aug. 25, 2025) (same). As those courts have indicated, it is equally obvious that officers must intervene to stop exploitation by other officers. (*Id*. at *19 ("There has never been . . . .a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability.").

It would have been obvious to any reasonable officer that they had a duty to intervene against Commander Aber's sexual abuse. As Judge Starnella already found, "[t]he sexual allegations underlying this lawsuit are serious and appalling." [Dkt. 88, p. 13]. Plaintiffs were forced to strip naked on camera, only to have that footage viewed by the chief official of the jail for his sexual gratification. Commander Aber told Defendants

12

Slade and Harris directly that he was watching the female strip search videos. (FAC, ¶¶ 125, 133). Both Defendants Slade and Harris recognized that watching these videos was wrong. (FAC, ¶¶ 126, 132). Yet they did nothing to intervene against his sexual exploitation. Judge Starnella already framed why Defendants' apathy was so intolerable:

> Plaintiffs were dependent on Defendants, particularly Defendant Aber, for basic needs, safety, and access to privileges, and could have been subject to discipline at Defendants' behest. That imbalance of power magnifies the vulnerability inherent in the alleged misconduct and distinguishes this case from others where there is no such dynamic.

[Dkt. 88, p. 9]. Any reasonable officer would have known that it was unacceptable to sit idly by while they knew that Commander Aber was treating Plaintiffs "in a way antithetical to human dignity." *Hope*, 536 U.S. 745.

County Defendants assume that any involvement by Defendants Slade and Harris terminated in 2018 and therefore predate any clearly established law. That is wrong for two reasons. *First*, drawing inferences in Plaintiffs' favor, the FAC alleges Defendants Slade and Harris first learned of Commander Aber's misconduct in 2018 and 2021 respectively, and they then continually failed to intervene over the ensuing years—well after *Bledsoe* clearly established the law. *Second*, Defendants' conduct was so egregious that it would have always been clear to a reasonable officer that it was unlawful.

## II.     The section 131 claims against Sergeant Slade are not impermissibly retroactive (Claims 16–19).

County Defendants insist that "Slade's relevant conduct took place in 2018." (Motion, p. 7). Starting from that faulty assumption, County Defendants insist that any claim under the Enhance Law Enforcement Integrity Act against Sergeant Slade is impermissibly retroactive because "[s]ection 131 did not exist in 2018 and does not apply retroactively." (Motion, p. 7). That takes an impermissibly narrow view of the FAC's

allegations and Sergeant Slade's continuing failure to intervene.

The FAC alleges that Commander Aber first approached Sergeant Slade with a proposal to watch the female strip search videos in 2018. (FAC, ¶ 124). 2018 was the first instance in which Sergeant Slade knew that Commander Aber was abusing his access to the strip search videos yet failed to stop him, but it was not the last. Slade did not unlearn this knowledge. Instead, Sergeant Slade continuously failed to intervene from 2018 (when he first learned of the misconduct) to 2024. (FAC, ¶ 165–174) (explaining that preliminary reviews of data, which is automatically wiped after a period of time, showed continuing abuse by Commander Aber between 2019 and 2024). Sergeant Slade is therefore liable under section 131 for failing to intervene against Commander Aber's abuse from when section 131 was enacted in 2020 to when Commander Aber resigned in 2024.

## III.     La Plata County is liable under *Monell* (Claims 9–11).

Plaintiffs bring three *Monell* liability claims in the First Amended Complaint: (1) failure to supervise or discipline; (2) an unconstitutional policy or custom; and (3) failure to train. (FAC, ¶¶ 277–298). County Defendants move to dismiss these claims without analyzing the different theories under which each claim is brought. Each of Plaintiffs claims are sufficiently pled and the Court should deny County Defendants' Motion.

### A. The Prison Rape Elimination Act put Defendants on notice of the extreme risk of sexual misconduct in jails, but La Plata County opted out of compliance.

Even before Commander Aber's conduct was publicly reported, County Defendants had ample notice that jails were hotbeds of sexual assaults. Congress passed the Prison Rape Elimination Act (PREA) in 2003. 34 U.S.C. § 30301 *et seq*. In enacting PREA, Congress made extensive, disturbing findings, including that: (a) a conservative

14

estimate is that at least 13% of the inmates in the United States have been sexually assaulted in prison; (b) most prison staff are not adequately trained or prepared to prevent, report, or treat inmate sexual assaults; (c) prison rape often goes unreported, and inmate victims often receive inadequate treatment for the severe physical and psychological effects of sexual assault – if they receive treatment at all; and (d) "The high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution." 34 U.S.C. § 30301(1–15).

To combat these "actual and potential violations of the United States Constitution" in state and local facilities, PREA employs a grant program.[2] If a facility submits proof of compliance with the Attorney General's PREA regulations—which are designed to prevent sexual abuse in prisons," then they receive a full federal grant. If a facility does not submit proof of compliance with PREA regulations. they "demonstrate [] indifference" to the Eighth Amendment rights of its people, and any federal grant the state receives for prison purposes will be reduced by 5%. 34 U.S.C. § 30301(13); 34 U.S.C. § 30307(e)(2).

PREA is not focused just on detainee-on-detainee sexual abuse. And it even specifically applies to "[v]oyeurism by a staff member, contractor, or volunteer," including "invasion of privacy of an inmate, detainee, or resident by staff for reasons unrelated to official duties, such as peering at an inmate who is using a toilet in his or her cell to perform bodily functions; requiring an inmate to expose his or her buttocks, genitals, or breasts; or taking images of all or part of an inmate's naked body or of an inmate performing bodily functions" 28 C.F.R. § 115.6.

PREA also specifically regulates cross-gender strips searches. "The facility shall

---

[2] PREA applies to both state and local facilities. 28 C.F.R. § 115.5.

15

not conduct cross-gender strip searches or cross-gender visual body cavity searches (meaning a search of the anal or genital opening) *except in exigent circumstances* or when performed by medical practitioners." *Id.* § 115.15(a) (emphasis added).[3] PREA also considers technology, stating that "[w]hen installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology, the agency shall consider how such technology may enhance the agency's ability to protect inmates from sexual abuse." *Id.* § 115.18(b).

Despite PREA identifying the risk posed by voyeurism in jails, prescribing solutions and funding to prevent this voyeurism, and flagging that non-compliant facilities "demonstrate such indifference" to the constitutional rights of its people, La Plata County Jail "has not opted to comply" with PREA, forgoing the funding and compliance mechanisms that could have prevented the violence inflicted against Plaintiffs. (Ex. 1, PREA Opt Out, p. 2).[4]

### B.    Legal standard for Plaintiffs' *Monell* claims.

A party states a *Monell* claim if they allege (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). Municipal policy or customs can come in the form of formal regulations, informal customs, a decision by an employee with final policymaking authority, a policymakers ratification of a subordinates action, or a failure to train or supervise

---

[3] "Strip search means a search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia." *Id.* § 115.5.

[4] This Court may take judicial notice of the County's "Policy 606" without converting this briefing into a motion for summary judgment because it is a governmental regulation. *Fuqua v. Santa Fe Cnty. Sheriff's Office*, 157 F.4th 1288, 1298 (10th Cir. 2025).

16

employees. *Murphy v. City of Tulsa*, 950 F.3d 641, 644 (10th Cir. 2019).

    **C.**    **Claim Ten: County Defendants maintained an unconstitutional formal regulation or policy statement.**

Under La Plata Jail policy, officials with a rank of lieutenant or above are given unfettered access to view the strip search footage that is stored on evidence.com. (FAC, ¶ 96, 287–90). This is a facially unconstitutional policy.

Unequivocal Tenth Circuit and Supreme Court precedent states that opposite-gender strip searches are unconstitutional absent exigent circumstances. *See Griffith*, 129 F.4th at 826–28. As the caselaw cited in *Griffith* makes clear, the presence of someone of the opposite sex at the strip search, even if they are not the one conducting the strip search, is just as objectionable. *Id.* (citing *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995) (discussing privacy concerns stemming from a body cavity search of inmates in view of members of the opposite sex)).

While this case implicates cross-gender viewing of recordings, rather than live, strip searches, the standards discussed in *Griffith* apply with equal force. *Griffith* focuses on the act of visually inspecting someone of the opposite sex; there is no need for it to be the cross-gender *performance* of the strip search. *See Cumbey*, 684 F.2d at 714 (finding plausible constitutional claim when plaintiff alleged naked male inmates were subjected to "a certain amount of viewing" by female officers). That violation occurs whether the defendant views the search live or on video.

For example, in *Griffin v. Ortiz*, the plaintiff alleged that a correctional officer invited staff and other inmates to watch a recording of the plaintiff being strip searched. 2025 WL 1071361, at *9 (D. Colo. Jan. 6, 2025), *report and rec'n adopted,* 2025 WL 925846 (D. Colo. Mar. 27, 2025). The court held that it was clearly established that an inmate may

17

not be subject to a humiliating strip search unless reasonably related to a legitimate penological interest. *Id.* Importantly, "the Court d[id] not find a meaningful distinction between subjecting an inmate to a humiliating strip search in full view of other inmates in the first instance and replaying a video of that same humiliating strip search to other inmates without a legitimate penological reason for doing so." *Id.*

In fact, the County Defendants' policy of recording these strip searches makes it even more unreasonable than a live strip search. In *Vo v. Gilmore*, the plaintiff challenged the facility's policy of recording strip searches. 2020 WL 10052602, at \*8 (W.D. Pa. Nov. 2, 2020), *report and rec'd adopted*, 2021 WL 1807872 (W.D. Pa. May 6, 2021). The court first noted that "[c]ases in which courts have held that video recorded strip searches violate constitutional rights have implicated privacy concerns beyond the fact of recording, such as an official of the opposite sex viewing or recording the search." *Id.* The *Vo* court continued, noting the following precautions the facility had taken regarding strip searches and videos: the use of an opaque barrier to shield inmates' private areas from the camera's view; restricting access to the video feed; viewing or storing the recordings only as needed; and automatically deleting recordings within 30-45 days unless there is a demonstrated need to preserve them. In addition, no female deputies were assigned to the unit where the video feed was available. *Id.* Because the facts in *Vo* showed that the searches were merely recorded, and the jail used these precautions to successfully prevent members of the opposite sex from viewing the search, the Court rejected these *Monell* claims. *Id*.

*Vo* is useful as contrast—each of the above precautions could have reasonably been implemented at the La Plata Jail, and could have prevented the constitutional

18

violations described in the FAC. Instead, County Defendants enacted a blanket policy permitting cross-gender viewing of strip searches even in the absence of exigent circumstances. This policy was facially unconstitutional. While the Jail's policy restricts access of strip search videos to lieutenants and up, Constitutional limits are based on the gender of the person viewing the strip search, not his or her rank.

Because County Defendants' formal policy is facially unconstitutional, it necessarily establishes the causation and state of mind requirements of *Monell* liability. *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1240–41 (10th Cir. 2020) ("For the causation and state-of-mind elements, Hinkle can satisfy his burden by demonstrating that the County's policy is facially unlawful.").

**D.    Claim Ten: County Defendants maintained an unconstitutional informal custom amounting to well-settled, widespread practices.**

In addition to the facially unconstitutional policy described above, the Jail maintained an unconstitutional informal custom amounting to widespread practice of permitting lieutenants and up unfettered, unmonitored, unlimited access to strip search videos that were retained for times far beyond any penological interest.

The Jail maintained an informal, unconstitutional custom of permitting unfettered, unmonitored, unlimited access to strip search videos that were retained for times far beyond any penological interest. As the FAC explains, the Jail had this custom because it, as a matter of custom: did not monitor access to strip search videos; did not limit access by gender; did not conduct periodic audits of video viewing; kept videos for no legitimate purpose, such as videos that did not capture contraband or force; and retained the footage for years, far beyond any legitimate penological interest. (FAC, ¶¶ 156–64, 285–98).

The informal custom was the cause of Plaintiffs' injuries. "To establish the

causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (internal quotation marks omitted). County Defendants were the moving force behind Plaintiffs' injury. This informal custom condones and contemplates men accessing and viewing women's strip searches going back at least half a decade. This policy necessarily causes men to view women's strip searches without a penological purpose, which is a constitutional violation. And the County's policy caused female detainees to have male staff view their strip searches—the conditions that led directly to Aber's misconduct.

Plaintiffs satisfy the deliberate indifference standard by showing that County Defendants have "actual or constructive notice that [their] action or failure to act is substantially certain to result in a constitutional violation, and [they] consciously or deliberately choose[] to disregard the risk of harm. . . . In a narrow range of circumstances [] deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]" *Id.* at 771 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).

A "city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 395 (1989) (O'Connor, J., concurring in part and dissenting in part)). The Jail's policy of unfettered, unmonitored, unlimited male access to years of female strip search videos beyond any penological interest was so predictably led to

20

deprivation of Plaintiffs' rights and satisfies *Schneider* and *Connick*.

PREA's passage in 2003 eradicates any claim of ignorance of sexual abuse by staff members through voyeurism. PREA regulations specifically define voyeurism as a type of sexual abuse that can be perpetrated by detention staff. 28 C.F.R. § 115.6. The La Plata Jail knew of PREA's requirements and, in 2016, issued a policy stating that "[t]he LPCDF has not opted to comply with all of the requirements of the Department of Justice PREA Rules and Standards[.]" (Ex. 1, PREA Opt. Out, 2). As noted in the PREA findings, sexual abuse in custody is a serious and pervasive problem. *See supra*, Section III.A. For example, the Senate Permanent Subcommittee on Investigations issued a report in 2022 finding that, *inter alia*, "BOP employees sexually abused female prisoners in at least two-thirds (19 of 29 facilities) of federal prisons that have held women over the past decade."[5] PREA also specifically regulates cross-gender strip searches, limiting them to exigent circumstances due to the opportunity for abuse. 28 C.F.R. § 115.15(a).

The precautions described by the court in *Vo*, 2020 WL 10052602, at *8, represent the common-sense limitations that other facilities put on strip searches, none of which La Plata enacted here. County Defendants instead rejected any such measures and PREA's guidelines, and deliberately blinded themselves to the well-documented reality of correctional staff sexual abuse by adopting a policy that caused Aber to perpetrate his abuse without getting caught until a *different* investigation uncovered his crimes. That is the definition of deliberate indifference. County Defendants' custom of no gender viewing

---

[5] *Sexual Abuse of Female Inmates in Federal Prisons* (December 2022), available at https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf

restrictions, monitoring of viewing, and years-long retention standards led to the highly predictable violations of Plaintiffs' constitutional rights. *See also Tafoya v. Salazar*, 516 F.3d 912, 921 (10th Cir. 2008) (denying Sheriff's motion for summary judgment because plaintiff presented evidence that Sheriff "knew of the dangerous conditions at the jail and deliberately elected not to remedy them").

### E. Claim Nine & Eleven: County Defendants failed to supervise, discipline, or train its employees, causing these constitutional abuses.

Because of the similarities between claims nine (failure to supervise or discipline) and eleven (failure to train), Plaintiffs address them together. On these theories, Plaintiffs advance a "single-incident" theory of liability.

To establish a *Monell* claim for failure to train/supervise, Plaintiffs need only plead (1) a policy or custom of deficient training, (2) that policy caused an injury, and (3) the county adopted the policy with deliberate indifference. *Packard v. City and Cnty. of Denver*, 173 F.4th 1247, 1263 (10th Cir. 2026).

**1.      The County provided deficient training.** The FAC alleges that County Defendants failed to train their employees to monitor video usage, to set meaningful limits on who could access the video database and for what purpose, to report any suspicious activity on evidence.com, or to put reasonable limits on retention periods. (FAC, ¶¶ 136–47, 291–98). The FAC also alleges, *inter alia*, that County Defendants failed to discipline or supervise employees who sexually harass female employees, failed to supervise staff use of the evidence.com database, and failed to supervise staff relations with inmates. (*Id.* at ¶¶ 277–84, 291–98).

**2.      The deficient training caused Plaintiffs' constitutional injuries.** County Defendants' failure to train their employees to monitor video usage, to set meaningful

limits on who could access the video database and for what purpose, to report any suspicious activity on evidence.com, or to put reasonable limits on retention periods was the cause of Plaintiffs' injuries. Additionally, their failure to supervise Aber's conduct in any way caused Plaintiffs' injuries. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409–10 (1997) ("The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.").[6]

3.    **The County adopted deficient training with deliberate indifference.** For their single-incident theory, Plaintiffs establish the County was deliberately indifferent when they show "(1) the municipality's policymakers know to a moral certainty that their employees will confront a given situation; (2) the situation presents the employee with a difficult choice of the sort that training or supervision will make less difficult; and (3) the wrong choice will frequently cause the deprivation of a citizen's constitutional rights." *Packard*, 173 F.4th at 1263 (cleaned up).

Instructive here is the Seventh Circuit's *en banc* decision in *J.K.J. v. Polk County*, which sustained a *Monell* claim for sexual misconduct in jails, 960 F.3d 367 (7th Cir. 2020). In that case, a corrections officer repeatedly sexually assaulted two female inmates. Plaintiffs brought *Monell* claims against the county for "failure to properly train the jailers in the face of obvious and known risks to female inmates." *Id*. at 378. In that case, the court held that the risk of sexual assault was known and obvious, because the detention setting "is a tinderbox for sexual assault." *Id.* at 382. "A reasonable jury could have viewed

---

[6] This definition of causation overlaps with the three-pronged analysis for deliberate indifference, discussed more thoroughly infra, Section 3.

23

the jail's denigrating culture as confirming the undeniable risk that a guard would grow too comfortable, lose his better angels, and step over the clear line marked in Polk County's written policies." *Id.*

> And with red lights flashing, Polk County chose the one unavailable option—doing nothing. It did not change its sexual abuse policy, institute a training, inquire of female inmates, or even call a staff meeting. With the writing on the wall, Polk County deliberately chose to stand still, or at least a reasonable jury could have so concluded.

> Having taken no action despite the obvious and known risk of sexual assaults in its jail, Polk County could not claim a lack of notice, much less surprise, upon learning that Christensen sexually assaulted J.K.J. and M.J.J. The County's written policies were lacking and its training on the topic was barely existent. . . . The County's inaction following knowledge that the existing program was not working—Jorgenson's sexual misconduct underscored that reality—was sufficient to demonstrate deliberate indifference. Or, as the Supreme Court put the same point in *City of Canton*, the necessity to act, whether by different training or new preventative measures, was "so obvious" and "the [existing] inadequacy so likely to result in a violation of constitutional rights" that a deliberate choice to stay the course could be seen as a policy for which Polk County bears legal responsibility.

*Id.* at 383.

The County knew to a moral certainty that its employees would confront strip searches because Sheriff Smith ordered Jail staff to conduct these and maintain the challenged strip search recording and retention policies. (FAC, ¶¶ 22, 85–104). And there is no doubt that strip searches in the Jail, which is a "tinderbox for sexual assault," presents a difficult situation. Indeed, the threat of sexual misconduct in detention facilities prompted Congress to pass PREA in 2003. PREA mandates training for staff because such training will help staff make decisions less likely to lead to the deprivation of detainee's constitutional rights.

Supervision and training regarding cross-gender viewing of strip searches would

24

have prevented Aber's misconduct. Sergeant Slade and Lieutenant Harris both knew that Aber was watching female detainees' strip search videos absent exigent circumstances— a Constitutional violation—and did not report him. (FAC, ¶¶ 122–135). If they had been properly trained on reporting, Commander Aber's Constitutional violations would have been reported and prevented. Instead, they continued for years. Moreover, if the County had implemented *any* sort of supervision of the automatically generated evidence.com audits of strip search video access, it would have stopped Aber's misconduct.

The "red lights flashing" in Polk County were the same ones that were flashing in La Plata County. The Sheriff's Department told a Durango Police Department officer that the Durango Police took accusations of sexual harassment more seriously than the Sheriff's Department. (FAC, ¶¶ 36–47). The Sheriff's Department hired two known sexual harassers. (*Id.* at ¶¶ 43, 47). In addition, the Sheriff's Department hired Aber despite a credible report of sexual harassment. (*Id.*). Commander Aber's conduct only amplified those flashing red lights, taking female inmates on one-on-one errands, visiting their cell without an active body-worn camera, pinning female inmates against the wall and saying he owned them, and secreting inmates into his office, with them under his desk near his crotch. (FAC, ¶¶ 36–84). Aber also harassed the Jail's female employees, so much so that in 2024, fourteen of the Jail's female employees came forward to report his sexual harassment. (*Id*. at ¶¶ 76–84). Plainly, "the existing program was not working." *J.K.J.*, 960 F.3d at 383. In the face of this reality, "the necessity to act, whether by different training or new preventative measures, was 'so obvious' and 'the [existing] inadequacy so likely to result in a violation of constitutional rights' that a deliberate choice to stay the course could be seen as a policy for which [La Plata] County bears legal responsibility." *Id.*

(quoting *City of Canton*, 489 U.S.at 390).

F.    **County Defendants' Motion cites irrelevant cases and does not analyze the elements of the claims.**

Rather than address Plaintiffs' *Monell* claims individually, Defendants lump all of Plaintiffs' *Monell* theories together and argue that the Court should dismiss them based on broad principles. The cases relied on by Defendants, which they hold out as "circuit authority rejecting similar claims," are inapposite here. County Defendants' caselaw can be separated into two categories.

1.    **Cases stating the city properly trained the defendants** *in that particular case.* Start with *Barney*, in which the Tenth Circuit held that the municipality was not deliberatively indifferent because they trained defendant "on offenders' rights, staff/inmate relations, sexual harassment, *and cross-gender search and supervision*," and plaintiff did not call into question the adequacy of those trainings. 143 F.3d at 1308 (emphasis added). That is the exact opposite of this case, where Plaintiffs have alleged a *failure* to train with regard to "cross-gender search[es]." Defendants' reliance on *Andrews v. Fowler*, is equally misplaced. 98 F.3d 1069 (8th Cir. 1996). There, the city's training and supervision included "two weeks of on-the-job training with another officer," "officers were sent to the police academy for training within one year of when they were employed by the department," and "officers who did not pass the academy training were not retained." *Id*. at 1076–77. The *Andrews* claims hinged entirely on one theory: that because this otherwise comprehensive training did not include a training to not rape, the city was liable. *Id*. The Eighth Circuit held that the city's training was adequate, *and* that it so obvious that officers should not rape that no training is required. *Id.*; *see also Schneider*, 717 F.3d 760 at 774 (concluding that "[s]pecific or extensive training hardly seems necessary for a jailer

26

to know that sexually assaulting inmates is inappropriate behavior"); *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1160 (9th Cir. 2014). That reasoning is inapposite here. When and how strip searches can be conducted and reviewed (sometimes) is more nuanced than when a rape is permissible (never), so training is necessary. Moreover, cases such as *Andrews* and *Schneider* don't address the county's failure to supervise. Supervision and monitoring of the strip search videos was required here. Indeed, adequate supervision is necessary to prevent even obviously inappropriate behavior, such as rape.

2.    **Cases stating the background check was adequate *in that particular case*.** In *Schneider*, the Tenth Circuit also rejected a *Monell* claim because the background check was adequate. 717 F.3d at 773; *Brown v. Flowers*, 2023 WL 6861761, at *9–10 (10th Cir. 2023) (finding inadequate background check did not cause constitutional violation because plaintiff failed to make any argument on the causation element of her *Monell* claim). That reasoning is inapplicable here, where Plaintiffs have explained with detailed examples how the background checks by County Defendants were constitutionally deficient. (FAC, ¶¶ 36–50). And in any event, these cases on the adequacy of background checks are irrelevant here, where Plaintiffs are not alleging a claim for negligent hiring.

Finally, County Defendants attempt to gain goodwill by stating that it was their investigation that uncovered Commander Aber's horrific conduct, complementing their own "vigor and thoroughness." (Motion, p. 23). The Court should not credit County Defendants' assertion; County Defendants uncovered that Aber had been viewing strip search videos of over a hundred women thousands of times at least as far back as *2019* when it was investigating allegations of sexual harassment by *fourteen* female jail

27

deputies. (FAC, ¶¶ 165–179). County Defendants' belated investigation, after it countenanced Commander Aber's abuse, does not cure their prior violations.

## IV.    The County is liable for Commander Aber's torts (Claim 20–22).

Defendants argue that Commander Aber was acting outside the scope of his employment when he abused his access to the strip search videos. (Motion, p. 29). Defendants conflate an employee's actions (which must be in the scope of employment to support respondent superior liability) with the employees motives (which do not bear on the scope of employment analysis).

Plaintiffs agree that "[a]n employer may be held vicariously liable for an employee's tort only when the tort is committed within the course and scope of employment." *Moses v. Diocese of Colorado*, 863 P.2d 310, 329 (Colo. 1993). In deciding whether a priest acted within the scope of his employment, the *Moses* court focused on the priest's actions, not his state of mind *Id*. at 330 ("[S]exual intercourse with a parishioner is not part of the priest's duties nor customary within the business of the church[,] [because] [s]uch conduct is contrary to the principles of Catholicism and is not incidental to the tasks assigned a priest by a diocese."). *Moses* concludes that an employer is liable in tort for its agent's conduct when that agent has engaged in his customary duties and engaged in acts that further the customary business of the employer. *Id.* at 330; *Cisneros v. Elder*, 506 P.3d 828, 833 (Colo. Apr. 11, 2022) (cautioning courts to "construe the CGIA immunity provisions narrowly," and holding that sheriff's false imprisonment was within the scope of his work even if he acted with bad intent). If courts rejected *respondeat superior* claims whenever a defendant acted with bad intent, it would produce the "absurd result of allowing pre-conviction incarcerated claimants to recover for injuries caused by the negligent operation of a jail but not for those caused by the intentionally tortious operation

28

of that same jail." *Id.* at 833–34.

Defendants admit that Commander Aber's actions fell within the scope of his work: "[r]equiring inmate strip searches, recording those strip searches and subsequently reviewing those recordings for correctional purposes was within the scope of Aber's employment and furthered the business of a correctional institution." (Motion, p. 29). County Defendants are therefore liable under *respondeat superior* despite Commander Aber's malintent.

## V.    <u>Defendants Slade and Harris are liable for their torts. (Claim 22).</u>

Defendants first argue that the tort claims cannot be sustained against Defendants Slade and Harris because they lacked knowledge that Commander Aber was abusing his access to the strip search videos. As explained above, the FAC plausibly alleges that they did know he was abusing his access to these videos. *See supra*, Section I.B.

Defendants next argue that the tort cannot be sustained against Defendants Slade and Harris because the CGIA immunizes government actors from discretionary acts. (Motion, p. 29–30). The "discretionary act" exception under the CGIA has "a specialized and limited meaning," and applies only to acts that are "of a judgmental, planning, or policy nature." *Valanzuela*, 889 F. Supp. 1409, 1422 (D. Colo. 1995) (quotations omitted). Latching on to the "judgmental" variety, Defendants compare themselves to the officers in *Leake v. Cain*, who were immune for their decision to *not* arrest someone because the decision of whether to arrest someone is committed to an officer's sound discretion. 720 P.2d 152, 163–64 (Colo. 1986). The officers in *Leake* were immune because officers have wide discretion on who to not arrest. *See Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005). In contrast, officers do not have discretion to fail to intervene against constitutional violations of which they are aware. *Bledsoe,* 53 F.4th at 616.

Finally, Defendants argue that the CGIA's waiver for "operation" of a jail should not apply here because Commander Aber's conduct was unrelated to the conduct of the Jail. (Motion, p. 31). "[T]he term 'operation' is defined in [the CGIA] as the act or omission of a public entity or public employee in the exercise and performance of the powers, duties, and functions vested in them by law with respect to the *purpose* of the facility." *Flores v. Colo. Dep't of Corr.*, 3 P.3d 464, 466 (Colo. App. 1999). The "purpose of a correctional facility is to manage convicts safely and effectively." *Id.* Maintenance of a visitor parking lot is not core to that mission because inmates do not use that parking lot. *Pack v. Arkansas Valley Corr. Fac.*, 894 P.2d 34, 37 (Colo. App. 1995). But maintenance of a visitor area that inmates do use is core to that mission. *Flores*, 3 P.3d at 466. Defendants admit that conducting, recording, and preserving strip searches and strip search videos are actions directly related to inmates and their safety. (Motion, p. 29). The CGIA therefore waives liability for Commander Aber's viewing of those strip search videos.

## VI.    The Board and Sheriff Smith and proper defendants.

Plaintiffs agree with County Defendants that "Sheriff Smith is [a] proper official defendant as he is the final policymaker of the jail." (Motion, p. 27). But Colorado statute directs Plaintiffs to also name the Board of County Commissioners of the County of La Plata "in all suits or proceedings by or against [the] [C]ounty." C.R.S. § 30-11-105. The County is therefore also a proper defendant.

## CONCLUSION

Commander Aber's abuse was made possible only through the policies of his employer and the apathy of his subordinates. Plaintiffs have alleged allegations against these codefendants sufficient to survive the pleading stage. The Court should therefore deny County Defendants' Motion to Dismiss.

Respectfully submitted this 15th day of May 2026.

<u>s/ Neil S. Sandhu</u>
Neil S. Sandhu
Virginia Hill Butler
Katie Wiese Valiant
Siddhartha Rathod
Qusair Mohamedbhai
Felipe Bohnet-Gomez
Omeed M. Azmoudeh
kw@rmlawyers.com
sr@rmlawyers.com
qm@rmlawyers.com
fbg@rmlawyers.com
oa@rmlawyers.com
vb@rmlawyers.com
ns@rmlawyers.com
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence St., Suite #100

John Baxter
JOHN BAXTER ATTORNEY AT LAW
1099 Main Ave., Suite 500
Durango, Colorado 81301
(970) 903-9578
baxterlaw@gmail.com

*Interim Class Counsel*

31